677 F.2d 193
 3 Employee Benefits Ca 1352
 David S. ALLEN, Plaintiff-Appellee-Cross-Appellant,
v.
THE KATZ AGENCY, INC. EMPLOYEE STOCK OWNERSHIP PLAN,
Defendant-Appellant-Cross-Appellee,
The Katz Agency, Inc., Defendant-Cross-Appellee,
Samuel T. Jones, Oliver T. Blackwell and James Greenwald, as
Trustees of The Katz Agency, Inc. Employee Stock
Ownership Plan, Defendants.
 No. 486, Docket 81-7615.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 3, 1981.
Decided April 8, 1982.
 
 David Fleischer, New York City (Charles Burton, Timothy P. Fisher, William Bruce Johnson, Battle, Fowler, Jaffin & Kheel, New York City, of counsel), for defendant-appellant-cross-appellee.
 James F. Rittinger, New York City (George L. Mahoney, Satterlee & Stephens, New York City, of counsel), for plaintiff-appellee-cross-appellant.
 Before FRIENDLY, OAKES, and PIERCE, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This case arose out of the termination of employment of an executive (David S. Allen) by a national advertising representative for radio and television stations, The Katz Agency, Inc. (Katz). Allen was the owner of 15,000 shares of Katz common stock purchased pursuant to written agreements incorporating a by-law restriction requiring that the shares be resold to Katz at book value upon his termination. He also had a vested interest in Katz's Employee Stock Ownership Plan (Plan), which at the time of his termination on February 17, 1978 included a company stock account consisting of 4,071 shares of Katz common stock and 655 shares of Katz preferred. The Plan contained a "put" provision providing that at the employee's option (which Allen exercised) either the trust or the company would repurchase his shares at book value as of the preceding December 31. Claiming that the values he received were inadequate and understated, Allen brought suit in the United States District Court for the Southern District of New York before Lee P. Gagliardi, Judge, against Katz, the Plan, and the Plan's trustees (actually members of the executive committee appointed to administer the Plan).
 
 
 2
 Allen sued the defendants under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., the federal securities laws, the common law of fraud, and New York labor law. The case was tried without a jury and the court after making extensive findings of fact rejected all claims except the claim that the Plan, by its express terms as amended in 1978, retroactively entitled Allen to the fair market rather than the book value of the stock in his company account. The court therefore awarded $123,473.43 plus interest and costs. The Plan appeals the judgment against it and we reverse. Allen cross-appeals the denial of his ERISA, common law fraud, and New York labor law claims and we affirm.
 
 FACTS
 
 3
 As the district court found, when Allen was terminated on February 17, 1978 he was a senior vice president, a member of the board of directors and its executive committee, and a Katz employee since 1959.
 
 
 4
 In 1971, pursuant to a recapitalization scheme, Katz amended its existing profit-sharing plan to become an employee stock ownership plan intended to qualify under section 401(a) of the Internal Revenue Code of 1954. The 1971 Plan contained a "put" provision in section 16 which provided that at the employee's option either the company or the trust created under the Plan would purchase the employee's shares, for a period of up to six months after those shares were distributed, at their fair market value. Fair market value was defined as the book value as of the December 31 coinciding with or immediately preceding the date on which the put option was exercised. In 1971 Katz also adopted a by-law similarly providing that Katz common stock could be issued or transferred only to the Plan or Katz employees at the book value of Katz common stock as of the December 31 coinciding with or immediately preceding the transaction. The by-law further provided that upon termination of employment for any reason, the Katz employee-stockholder was required to resell to Katz directly held stock at book value. All sales of Katz common stock to its employees from 1971 through 1978 were made at book value pursuant to written agreements incorporating the by-law restrictions. On October 11, 1976, after the enactment of ERISA, Katz amended the Plan. Section 16 of the 1976 Plan, however, contained a put provision similar to that of the 1971 Plan.
 
 
 5
 ERISA creates a category of exempt loan transactions allowing an employee stock ownership plan (ESOP) or the trust created under that plan to acquire company stock with the proceeds of loans from the company, its officers or directors, or its major shareholders. Since the enactment of ERISA, however, neither Katz nor the trust created under its Plan engaged in any such loan transactions, so Allen never received any Katz stock acquired with the proceeds of such loans.
 
 
 6
 The district court also found that in October 1976 the Katz board of directors, with the exception of Allen, decided to terminate Allen but did not inform him of the decision. Allen continued to perform his duties though excluded from important management decisions. On February 17, 1978, Allen received notice that he was terminated as of April 30, 1978. With the advice of counsel he later executed a termination agreement. Upon his termination he exercised his put option, receiving approximately $9.67 (the book value as of December 31, 1977) for each of the 4,071 shares of Katz common stock in his company stock account, for a total of $39,366.76. Under the Plan he also received at the time of his termination the value of his preferred stock and his other investment account, neither of which is involved here. As provided in the written agreement incorporating the 1971 by-law and in the termination agreement, Allen sold the 15,000 shares he held directly at the $9.67 per share book value, for a total of $145,050.69. Allen received a severance allowance under the termination agreement of $140,839.00, and released Katz "from any and all obligations to him" beyond those set forth in the agreement. Before executing the agreement both Allen and his attorney, on questioning whether there was an alternate method of valuing Katz stock, were informed by Samuel Jones, Katz's senior vice president of finance and treasurer, that book value was the only method.
 
 
 7
 On June 23, 1978, about four months after Allen's notice of termination, Katz consulted Kelso & Co. (Kelso), an investment banking company, which was thereafter retained to conduct an operations audit of the Katz Plan and to appraise the value of Katz common stock. Kelso informed Katz that ERISA required a change from book value to market value. In July 1978, using Katz financials through June 1978, Kelso estimated that the market value of Katz stock on December 31, 1978 would be $38.13 per share. On November 20, 1978 the Katz board of directors approved an amended Plan subject to a determination that the Plan qualified under section 401(a) of the Internal Revenue Code. Unlike the prior versions of the Plan, the 1978 Plan contained in section 17(b) a put provision giving distributees of Katz stock under the Plan the right to have Katz and/or the trust purchase their stock at its fair market value as determined by the Plan's executive committee. The 1978 Plan was made effective as of January 1, 1978, i.e., before Allen's termination, and section 3(a) of the amended Plan provided that "(e)ach Employee who is employed by an Employer on January 1, 1978 is automatically a Participant in this Plan." Nevertheless, the district court found, the Katz board of directors "did not intend that the Plan include terminated employees such as Allen who had already fully exercised their put option(s)."
 
 
 8
 In April 1979 Katz received from Kelso a report appraising Katz common stock as of December 31, 1978 at $40.00 per share. On May 30, 1979 Katz amended its by-laws to provide that all purchases and sales of directly owned Katz common stock would be at the fair market value adopted for purposes of the Plan. The by-law amendments became effective on May 19, 1979 and were not intended, it was found, to affect 1978 transactions such as Allen's sale of his 15,000 shares.
 
 DISCUSSION
 A. Retroactivity of the 1978 Plan
 
 9
 The court below held with regard to Allen's 4,071 shares under the Plan that the defendants could not evade the "plain meaning of the (amended) Plan's January 1, 1978 effective date...." Since Allen was an employee on that date, the court held that the Plan retroactively provided for a put at fair market value and thereby gave Allen a vested interest in the $123,473.43 difference between the value of his stock at market and at book. We reverse, as we agree with the Plan defendant that the court's retroactive application of the Plan to Allen overlooks the fact that Allen exercised his put and released Katz from all obligations in February 1978, well before the November 1978 adoption of the amendment.
 
 
 10
 Allen argues that the Plan should be strictly construed in favor of the employee, see Hoefel v. Atlas Tack Corp., 581 F.2d 1, 7 (1st Cir. 1978), cert. denied, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979), and that because he was employed by Katz on January 1, 1978, he was included as a participant in the 1978 Plan under section 3(a).
 
 
 11
 We find nothing in the language or history of the Plan amendment, however, to suggest that it was intended to apply to someone who had already received and sold his stock under the Plan's put option. In Paragraph Fourth of the termination agreement, Allen elected to take his ESOP distribution in cash, "valued as of March 31, 1978," to be paid "in a single lump sum as soon after the Termination Date as administratively practicable." Katz in fact paid Allen on April 1, 1978, valuing his ESOP distribution as of December 31, 1977, the preceding Anniversary Date as defined in the 1976 Plan.
 
 
 12
 We also find that Allen's release of Katz weighs against his retroactive inclusion in the 1978 Plan. In Paragraph Eighth of the termination agreement Allen and Katz, with exceptions not applicable here, each "release(d) and discharge(d) the other from any and all obligations to him or it, and each agree(d) that the other ha(d) no obligations, liabilities or indebtedness to him or it whatsoever." Allen nowhere excepted his stock-ownership rights from this release, as he did his pension rights. Paragraph Ninth of the termination agreement, moreover, states that the agreement "supercedes all other documents, correspondence, plans, practices, agreements and understandings relating to the subject matter of this Agreement, Employee's employment, termination of employment, compensation, benefits and severance pay" (emphasis added). The Plan, though not specifically named, was effectively a third-party beneficiary of the release in the termination agreement. See, e.g., Owens v. Haas, 601 F.2d 1242, 1250 (2d Cir.), cert. denied, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).
 
 
 13
 We hold only that the Plan as amended in November 1978 did not apply to an employee who had elected prior to the amendment to take his ESOP distribution in a cash lump sum, releasing his employer from liability. We need not reach, therefore, the question whether the Plan might have retroactive effect for other employees, e.g., for those retiring after May 20, 1978 who could have exercised their puts after November 20, 1978, the date the amended Plan was approved. Nor need we reach defendants' argument that the court below usurped the discretion to grant put options that is reserved solely to a plan's committee, see Paris v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc., 637 F.2d 357 (5th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981), whose decision is actionable only if arbitrary or capricious, 637 F.2d at 362.
 
 B. ERISA Claim
 
 14
 Allen cross-appeals from the court's rejection of his claim that the 1976 Plan was by 1978 facially violative of ERISA. If this claim were correct, Allen's release could be viewed as a nullity. Allen argues that the Katz Plan, intended to qualify as an ESOP, was subject to Treasury Regulations §§ 54.4975-7 and -11. Treasury Regulation § 54.4975-7(b)(1)(i) defines an "ESOP" as a plan meeting the requirements of, inter alia, id. § 54.4975-11. Section 54.4975-11(a)(7) states that "(a)n arrangement involving an ESOP that creates a put option must not provide for the issuance of put options other than as provided under § 54.4975-7(b)(10), (11), and (12)." Section 54.4975-7(b)(12)(iii) provides that "(t)he price at which a put option must be exercisable is the value of the security, determined under § 54.4975-11(d) (5)," which in turn states that "valuations must be made in good faith and based on all relevant factors for determining the fair market value of securities." Allen reads these regulations as allowing Katz to issue put options only if exercisable at fair market value.
 
 
 15
 We find these Treasury Regulations inapposite, as did the district court. Examination of these regulations in context shows that they would apply only if, as was not the case, Allen's put option had attached to employer securities that the Katz Plan had purchased with the proceeds of a loan from Katz or Katz fiduciaries, or if the Katz Plan had otherwise functioned as an ESOP within the regulations' requirements.
 
 
 16
 The Secretary of the Treasury promulgated the regulations on which Allen relies under the authority of Internal Revenue Code (I.R.C.) § 4975(e)(7). The Secretary of Labor acting under his ERISA powers, 29 U.S.C. § 1135, promulgated parallel regulations. See 42 Fed.Reg. 44383 et seq. (Sept. 2, 1977). I.R.C. § 4975(e)(7) defines an ESOP as a stock-bonus or money-purchase plan qualified under I.R.C. § 401(a) and designed to invest primarily in employer stock. See also ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6).
 
 
 17
 ERISA normally prohibits plan fiduciaries from undertaking, and the I.R.C. normally taxes, certain "prohibited transactions." See ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1); I.R.C. § 4975(c)(1). One transaction normally prohibited is the "lending of money or other extension of credit" between the plan and a "party in interest," ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), or a "disqualified person," I.R.C. § 4975(c)(1)(B). Disqualified persons or parties in interest include the employer and its officers, directors, and major shareholders. See ERISA § 3(14), 29 U.S.C. § 1002(14); I.R.C. § 4975(e)(2). Both statutes, however, exempt loans to ESOPs from such prohibitions. See ERISA § 408(b)(3), 29 U.S.C. § 1108(b)(3); I.R.C. § 4975(d)(3).
 
 
 18
 Treasury Regulation § 54.4975-7, and the parallel ERISA regulation, 29 C.F.R. § 2550.408b-3, merely state conditions for obtaining such exemptions for loans to ESOPs. Moreover, the specific subsections of those sections that govern put options, Treas.Reg. § 54.4975-7(b)(10), (11), (12) and 29 C.F.R. § 2550.408b-3(j), (k), (l), require put options on the terms they describe only in connection with "qualifying employer securit(ies) acquired with the proceeds of an exempt loan by an ESOP," Treas.Reg. § 54.4975-7(b)(10); 29 C.F.R. § 2550.408b-3(j). Because, as the court found below, Katz never attempted to make an exempt loan to the Katz Plan, these sections are irrelevant to Allen's put option.
 
 
 19
 Allen argues nonetheless that regardless of whether the Katz Plan engaged in exempt loan transactions, all put options in connection with an ESOP must conform to Treas.Reg. § 54.4975-7(b)(12)(iii), which requires by reference to id. § 54.4975-11(d)(5) that puts be exercisable at fair market value. See also 29 C.F.R. § 2550.408b-3(1)(3). This argument is flawed. First, "the Katz Agency, Inc. Employee Stock Ownership Plan" never functioned as an ESOP within the meaning of the Treasury or ERISA regulations. Merely intending the Plan to qualify as an ESOP does not make it one. There is no statutory or regulatory requirement that all stock-bonus plans be ESOPs. Second, there is no requirement that a stock-bonus plan (such as the Katz Plan) that does not engage in an exempt loan transaction grant a put option on any terms. Third, even if Katz had attempted to engage in exempt loan transactions, the I.R.C. does not retroactively impose conditions on plans but only penalizes those not in compliance by not granting tax benefits or exemptions. Katz here claims no exemption for any otherwise prohibited transaction, and only the federal government, not Allen, would stand to gain if Katz did. The put options in the 1976 Katz Plan thus were not regulated by the requirements for ESOPs set forth in ERISA, the I.R.C., or the implementing regulations.
 
 
 20
 We therefore affirm the district court on this point and also reject Allen's argument that the trustees' failure to conform the Katz Plan to the requirements applicable to ESOPs in effect at the time of his termination was a breach of fiduciary duty, see ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), for which a beneficiary may sue, see ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1) (B). The fiduciary obligation to discharge duties "solely in the interest of the participants and beneficiaries", ERISA § 404(a)(1), 29 U.S.C. § 1104(a) (1), surely did not obligate the trustees to pay Allen more than the value to which the Plan entitled him. In addition, a fiduciary's duty hardly extends to a requirement to have a benefit plan amended by the board of directors in a manner that increases the value of benefits to employees.
 
 C. Common Law Fraud Claim
 
 21
 Allen's fraud claim below was that the Katz board of directors knew prior to his termination on February 17, 1978 that the book value of $9.67 grossly understated the value of Katz stock, and that the board of directors deliberately concealed from Allen at the time of his termination its intent to change from book value to appraised market value shortly after Allen's termination. To substantiate this claim Allen testified that at a Katz board of directors meeting in June or July 1977, Jones mentioned that the company's method of valuing its stock might have to be changed, and Greenwald, Katz's president and chairman of the board, responded that the matter should be discussed at another time. Allen further testified that he believed Jones was holding a letter from Kelso at that time. Five witnesses for Katz, including Jones and Greenwald, testified that Jones never made the alleged statement. Two Kelso representatives testified that Kelso had not given Katz the advice Jones allegedly mentioned at the meeting, but neither witness had personal knowledge of any possible contacts between Katz and the president of Kelso in 1977. On the basis that Allen offered no corroborative evidence that Kelso was retained by Katz prior to June 1978, and that a letter dated March 23, 1978 from Jones to Kelso informing Kelso that Katz had amended its Plan in 1976 indicated to the contrary, the court did not find that prior to June 1978 Kelso had advised Katz to change from book value to fair market value.
 
 
 22
 Allen also offered the deposition testimony of Margaret Alcott, a former Katz employee, that Jones had advised her in 1977 not to exercise her put option because the stock was going to increase in value. The court noted that Jones testified in response that he was referring to the imminent increase in book value from $7.53 as of December 31, 1976 to $9.67 as of December 31, 1977.
 
 
 23
 In addition, Allen testified regarding two statements allegedly made to him by Peter R. Goulazian when Goulazian was Katz's vice president and director of marketing. First, Goulazian allegedly informed Allen that in May 1978 Frank McCann, executive vice president of Katz and a member of the board of directors, had told Goulazian that a study was being made in order to revalue Katz stock at its fair market value. At trial Goulazian denied having heard McCann make the statement or having repeated any statement by McCann to Allen. McCann also denied that he made the statement to Goulazian. Second, Goulazian allegedly reported to Allen in October 1978, just before the Plan was amended, that Greenwald, at a recent manager's meeting, had announced that Katz stock was being revalued at fair market value. Allen testified Goulazian told him that when Goulazian inquired how this change would affect former employees, Greenwald responded " 'em." The defendants denied that Greenwald made such a statement.
 
 
 24
 Allen also argued below that the wholesale denial by Katz's officers and directors that they ever discussed the fair market value of Katz stock was not credible. The only direct evidence of the directors' consideration of the value of Katz stock credited by the trial court, however, was Allen's testimony about an alleged conversation with Jones on Marco Island in 1974 concerning the market value of Katz stock.
 
 
 25
 After reviewing the above facts, the court found that the directors and officers of Katz "did not prior to June 1978 deliberately conceal knowledge of the market value of Katz stock, did not intend to change Katz's method of valuing its stock, and did not deliberately conceal such intent from Allen." While crediting Allen's testimony that Jones had made some inquiry regarding the value of Katz stock at the 1977 board meeting, that Allen had had some discussion about valuation with Jones on Marco Island in 1974, and that Greenwald had uttered the expletive, and while noting that it was uncontested that Jones told Alcott to hold onto her stock for an undetermined period, the court stated: "Each of these individual conclusions, however, does not necessarily indicate deliberate concealment." The court simply did not credit Allen's testimony regarding Goulazian's report of McCann's statement, either alone or in conjunction with the circumstantial evidence. The court believed the defendants' witnesses' denials that they were certain the book value of Katz stock grossly understated its fair market value and that there was a preconceived plan to change to fair market value.
 
 
 26
 In light of these findings, which we cannot say are "clearly erroneous," the fraud claim is simply groundless. Allen argues that the defendants' course of conduct amounting to "fraudulent intent or purpose" was evident from the chain of circumstances found by the trial court, see Connolly v. Gishwiller, 162 F.2d 428, 433 (7th Cir.), cert. denied, 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400 (1947). But even though the trial court could have concluded otherwise, its conclusions that the defendants had no intent prior to June 1978 to change Katz's method of stock valuation and that they did not deliberately conceal such an intent from Allen are not clearly erroneous. These conclusions were for the fact-finder to draw, and we defer to his superior perceptions of the witnesses.
 
 D. New York Labor Law Claim
 
 27
 Allen cross-appeals also from the district court's dismissal of his claim that defendants' failure to pay him the fair market value of his stock constituted willful denial of wages (i.e., retirement benefits) due him under New York Labor Law §§ 190, 198-c. Because we have concluded above that Allen was not denied any benefits to which he was entitled, we see no basis for such a claim. Therefore we affirm, and do not reach defendants' argument that ERISA preempts state law on this issue.
 
 
 28
 Since Allen in our view of the law is not a prevailing party, his claims for attorney's fees under ERISA and attorney's fees and liquidated damages under New York Labor Law § 198(1-a) are unavailable.
 
 
 29
 Judgment reversed in part and affirmed in part.