DISTRICT 65, UAW, Renee Cafiero, and William Monroe, Plaintiffs,

v.

HARPER & ROW PUBLISHERS, INC.; Minneapolis Star & Tribune Company; Marvin A. Asnes; Simon M. Bessie; Cass Canfield, Jr.; Kenneth B. Clark; Winthrop Knowlton; Barton H. Lippincott; Joseph W. Lippincott, Jr.; Gertrude G. Michelson; Brooks Thomas; John Cowles, Jr.; Otto A. Silha; Norman L. Cannon; Chester L. Logan; Edward A. Miller; Howard Aksen; Edward Hutton; Jane Isay; Prudential Insurance Company of America; and the Pension Benefit Guaranty Corporation, Defendants.

Raymond C. HARWOOD, Carolyn Reed and Glen Howard, on their own behalf and on behalf of all other persons similarly situated, Plaintiffs,

v.

HARPER & ROW PUBLISHERS, INC., Minneapolis Star & Tribune Company, Marvin A. Asnes, Simon M. Bessie, Cass Canfield, Jr., Kenneth B. Clark, Winthrop Knowlton, Barton H. Lippincott, Joseph W. Lippincott, Jr., Gertrude G. Michelson, Brooks Thomas, John Cowles Jr., Otto A. Silha, Norman L. Cannon, Chester L. Logan, Edward A. Miller, Howard Aksen, Edward Hutton, Jane Isay, and Fred A. Taylor, Defendants.

Nos. 82 Civ. 3657(MGC), 82 Civ. 4042(MGC).

United States District Court, S.D. New York.

Sept. 29, 1988.

Shea & Gould by Stuart A. Smith, Martin H. Samson, New York City, for plaintiffs Raymond C. Harwood et al.

Dreyer & Traub by Eugene Mittelman, New York City, for plaintiffs District 65, UAW et al.

Lawrence F. Landgraff, Gary M. Ford, Robert L. Furst, Stephen D. Schrieber, Kenton Hambrick, Washington, D.C., for Pension Benefit Guar. Corp. Office of the Gen. Counsel.

Weil, Gotshal & Manges by Nancy E. Barton, Dennis J. Block, Richard L. Levine, New York City, Attys. for the Harper & Row defendants.

## OPINION

CEDARBAUM, District Judge.

These two cases, which arise under the Employee Retirement Income Security Act (ERISA), have been consolidated for pre-trial purposes, and have already been the subject of three published opinions, reported at 670 F.Supp. 550 (S.D.N.Y.1987), 586 F.Supp. 118 (S.D.N.Y.1984) and 576 F.Supp. 1468 (S.D.N.Y.1983). The cases stem from the 1981 termination of the Harper & Row Publishers, Inc. Retirement Plan (the "Plan"), and are brought by Plan participants and their beneficiaries. Harper & Row Publishers, Inc. and its former directors and officers named as defendants in both actions (collectively "Harper & Row" or the "Harper & Row defendants") now move for summary judgment on plaintiffs' claims that the Harper & Row defendants used an improperly high interest rate to calculate lump-sum payments made to participants not qualified to receive annuities and to those who had a choice between annuities and lump-sum payments.

For the reasons discussed below, the motion for summary judgment is denied.

## BACKGROUND

Familiarity with the Court's earlier opinions in this case is assumed, and only those facts necessary to the determination of this motion will be set forth here.

In August 1981, Harper & Row announced its intention to terminate the Plan. Benefits were distributed to participants and their beneficiaries in December 1981. Harper & Row used the Plan's residual assets to purchase approximately one-third of its outstanding shares then held by defendant Minneapolis Star & Tribune Company. These two actions were brought to challenge the termination of the Plan and the calculation of the lump-sum benefits distributed. A class has been certified in the *Harwood* case. Plaintiffs Glen Howard and Carolyn Reed were designated by Judge Duffy as class representatives of a class consisting of "all Plan participants and beneficiaries in the Harper & Row Publishers, Inc. Retirement Plan who as a consequence of the termination of the Plan, were either offered or required to accept a lump-sum payment in lieu of an annuity."

The basic facts surrounding Harper & Row's selection of an interest rate to value lump-sum benefits for distribution on termination of the Plan are not in dispute. The following recitation is derived almost entirely from the facts to which the parties in both cases have agreed. *See* Joint Pre-Trial Order, Statement of Stipulated Facts.

The Plan was a defined benefit plan within the meaning of ERISA §§ 3(2) and 3(35), 29 U.S.C. §§ 1002(2) and 1002(35). It provided that upon reaching eligibility for retirement benefits, participants could elect to receive their benefits in various "actuarial equivalent" forms, including lump-sum payments. Beginning in 1980, the Plan Administrator decided to use as the interest rate for calculation of the present value of retirement benefits to be paid in lump-sum form the average of Moody's Corporate AAA Bond index rates for the three-

month quarter immediately preceding a participant's election.

In August 1981, Harper & Row announced its intention to terminate the Plan. Three insurance companies were invited to submit bids for the purchase of annuities for all accrued benefits. The invitations to bid did not contain any instructions as to the interest rate to be used in calculating either the present value of participants' accrued benefits in the Plan or any lump sums to be paid under the proposed contract. Nor did they contain any instructions as to which participants, if any, should receive their benefits in the form of a single lump-sum payment upon termination.

The bid by Prudential Insurance Company of America, which was the lowest bidder and which was eventually chosen, provided for annuities to be paid to all participants who had benefits with a present value of $1,000 or more. Under this proposal, 1,416 participants· would have received benefits in the form of single lump-sum payments, and 684 would have received annuities. In calculating its cost of providing annuities at retirement age, Prudential assumed a return on investment of 15 percent for the first 35 years and 6 percent thereafter. The present value of accrued benefits for those participants receiving lump sums was calculated by using a straight 15 percent interest rate. Harper & Row was not informed by Prudential of the interest rates used.

After receiving a complaint by at least one employee about the size of a lump-sum payment, Harper & Row inquired of Prudential about the possibility of providing annuities to participants with accrued benefits of less than $1,000. In April 1982, Prudential agreed to provide an option of receiving either an annuity or a lump sum to all Plan participants who had accrued benefits with a present value, as calculated by Prudential, of between $250 and $1,000. The additional cost to Harper & Row was approximately $187 for each participant who chose to receive an annuity. Of the approximately 269 participants offered this option, only about 17 chose an annuity.

In June 1982, Harper & Row also extended the annuity option to all participants who had received lump-sum payments of less than $250 and had been employed by Harper & Row for 10 or more years. Again, Prudential charged Harper & Row approximately $187 for each participant choosing an annuity. Of the approximately 46 participants offered this option, only about six chose an annuity. In all, approximately 1,435 Plan participants received lump-sum payments. Of these, some 292 had been offered the option of receiving an annuity and some 1,143 had not. Approximately 665 participants received their benefits in the form of an annuity.

This summary judgment motion addresses the propriety of the interest rate chosen by Harper & Row to discount accrued benefits to their present value for the purpose of calculating lump-sum payments. Because the interest rate is used as a discount factor, the higher the interest rate used, the smaller are the lump-sum payments.

Two narrow questions are raised. First, did the use by Harper & Row of Prudential's calculations of lump sum amounts, based on a 15 percent interest rate, satisfy as a matter of law the requirement of 29 C.F.R. § 2619.26(b) that the value of lump sum payments shall be determined "using reasonable actuarial assumptions as to interest"? Answering this question requires deciding whether the use of any one of the four rates described in § 2619.26 as "normally ... considered reasonable" is in and of itself sufficient to satisfy § 2619.26. Second, does the selection of any one of those four rates exhaust the plan administrator's fiduciary duty to participants? Other questions are not at issue. In opposing the motion, plaintiffs have not argued that the selection of the 15 percent rate was a prohibited transaction under ERISA § 406, 29 U.S.C. § 1106. They have not attacked the validity of § 2619.26. And they have not argued that § 2619.26 applies only to the Pension Benefit Guaranty Corporation (PBGC)'s determination of the sufficiency of the assets of a terminating plan to provide the benefits that have accrued, and not to the calculation of these

benefits for the purpose of distributing them to participants.

## DISCUSSION

### A. *Compliance With the Regulation*

In addition to requiring that lump-sum payments be valued "using reasonable actuarial assumptions as to interest," 29 C.F.R. § 2619.26 provides:

> The following interest assumptions are among those that will normally be considered reasonable.
>
> (i) The rate [used] by the plan for determining lump sum amounts prior to the date of termination. This rate may appear in the plan documents or may be inferred from recent plan practice.
>
> (ii) The rate used by the insurer in the qualifying bid under which the plan administrator will purchase annuities not being paid as a lump sum. (In the event the insurer does not provide the specific rate used, the rate may be estimated.)
>
> (iii) The interest rate used for the minimum funding standard account pursuant to section 302 of [ERISA] and section 412(b) of the Internal Revenue Code.
>
> (iv) The PBGC interest rate for immediate annuities in effect on the valuation date set forth in Appendix B to this part.

§ 2619.26(c)(2).

In calculating lump-sum benefits to be distributed, Prudential used a 15 percent interest rate. In calculating the cost of annuities, Prudential used a "split" rate of 15 percent for 35 years and 6 percent thereafter. Thus, the interest rate used to calculate lump sums was not precisely the same as the rate used to calculate annuities. Nevertheless, it is not disputed that the amount of each lump-sum benefit offered by Harper & Row was increased because of the inadvertent use of incorrect "early retirement factors" in an amount more than sufficient to offset the difference due to the use of the straight rather

than the split interest rate. Therefore, the Harper & Row defendants contend, the lump sum amounts actually distributed were equivalent to or more favorable than those that would have been paid under the rate used by Prudential, had the proper early retirement factors been used. Since the rate used by the insurer is one of those "that will normally be considered reasonable," *see* § 2619.26(c)(2)(ii), the Harper & Row defendants contend that they have satisfied the regulation's requirement that reasonable actuarial assumptions be used.[1]

Plaintiffs urge that the 15 percent rate could not possibly be "reasonable," because no individual investor in 1981 could have received a 15 percent rate of return by investing his lump-sum payment, at least if his retirement was a long time off. Thus, they claim that most Plan participants who received lump sums did not receive enough money to enable them either to purchase an annuity that would pay the amount upon their reaching retirement age to which they were entitled under the Plan, or to make investments themselves that would yield that amount as a return. Defendants do not dispute this, but point to 29 C.F.R. § 2619.26, which clearly provides that the use of certain interest rates not available to small investors over long periods is "normally" reasonable.

■ For three reasons, I conclude that there exist genuine issues of fact that preclude my finding as a matter of law that the regulation has been satisfied.

First, the four interest assumptions listed in the regulation are not set out as "safe harbors" that will automatically provide shelter from liability if they are used. The regulation states only that those interest rates will "*normally* be considered reasonable" (emphasis added). Thus, although use of one of these four rates may be evidence of reasonableness, or may create a presumption of reasonableness, it does

---

1. Harper & Row also contends that it met or came close to meeting the first interest rate listed in the regulation, the rate used by the Plan to calculate lump sums prior to termination. Since there is disagreement about how to calculate that rate, and since Harper & Row's argument that it has met the regulation's requirements as a matter of law depends only on its having met one of the rates listed therein, I need not decide whether another rate was also met.

not *ipso facto* preclude a finding that the rate used was not reasonable.

Second, plaintiffs have raised issues of fact to support their contention that even if use of the insurance company's rate ought normally to be considered reasonable, it was not reasonable in the latter half of 1981. The wide disparity at that time between the four rates listed in the regulation—which ranged from 7 to 15 percent—would clearly have led to substantially different valuations of lump sums for each of the four rates. This raises a question about whether all of the rates could have been considered reasonable at that time, especially given plaintiffs' uncontradicted assertion that the disparity between the rates in late 1981 was far greater than it has generally been at other times.[2] I recognize that the force of this argument, as well as of plaintiffs' argument that interest rates in late 1981 were at unusually high levels, may be somewhat blunted by the fact that the regulation itself was promulgated in January 1981, when interest rates and economic conditions may not have been very much different than they were later in the year.

Finally, plaintiffs have offered the deposition testimony of Donald A. Lockwood, an actuary experienced in employee benefit plan terminations, that the 15 percent rate was not "reasonable" because it would not allow a beneficiary to invest his lump sum and receive the benefit called for by the Plan upon his retirement. *See* Exhibit P to Affidavit of Stuart A. Smith dated January 5, 1988, at 119. Defendants contend that Lockwood is testifying to the legal meaning of a term contained in a regulation—namely, "reasonable actuarial assumptions as to interest"—and that the meaning of the term is not an issue of fact but only one of law. *See F.A.A. v. Landy,* 705 F.2d 624, 632 (2d Cir.), *cert. denied,* 464 U.S. 895, 104 S.Ct. 243, 78 L.Ed.2d 232 (1983) (testimony as to meaning of regulations inadmissible at trial); *United States v. In-*

*gredient Technology Corp.,* 698 F.2d 88, 96–97 (2d Cir.), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983) (testimony as to meaning of tax laws inadmissible). I cannot entirely discount the Lockwood testimony, however. Drawing all inferences against the moving party, as I must on a motion for summary judgment, *see Murray v. National Broadcasting Co.,* 844 F.2d 988, 992 (2d Cir.1988), the Lockwood testimony may be read as bearing on the issue of what assumptions are reasonable to an actuary, which (although similar words appear in a regulation) is susceptible of expert testimony from an actuary. *See Dooley v. American Airlines, Inc.,* 797 F.2d 1447, 1453–54 (7th Cir.1986), *cert. denied,* 479 U.S. 1032, 107 S.Ct. 879, 93 L.Ed. 2d 833 and 479 U.S. 1087, 107 S.Ct. 1292, 94 L.Ed.2d 149 (1987).

**B. *Compliance With Fiduciary Duty***

**1. Applicability of Fiduciary Duty**

Summary judgment must be denied for another reason as well. The Harper & Row defendants have not demonstrated as a matter of law that in choosing an interest rate to calculate the size of lump-sum payments, they satisfied their fiduciary duty to the Plan's participants.

The Court's earlier opinions in this case have established that although the decision to terminate a plan is not subject to fiduciary standards, *see* 576 F.Supp. at 1477–78, acts taken to implement such a termination subject a plan administrator to a fiduciary standard of care, 670 F.Supp. at 555–557. The Harper & Row defendants now belatedly attempt to reargue the point, contending that even if the Harper & Row defendants were acting as fiduciaries, their fiduciary duties required no more than compliance with the regulation.

Harper & Row points out that sections of ERISA dealing with fiduciary duty, ERISA §§ 403(c)(1), 404(a)(1), 406(a) and 408(b)(9), 29 U.S.C. §§ 1103(c)(1), 1104(a)(1), 1106(a)

---

**2.** The Court requested the parties to submit figures for these four rates as of December 31, 1979, so that the spread between them could be compared with that in the second half of 1981. No figure was available for the rate used by

insurance companies in qualifying bids on or around that date, *see* § 2619.26(c)(2)(ii). According to defendants, the other three rates were between 7% and 10.74%.

and 1108(b)(9), contain exceptions for activities under ERISA § 4044, 29 U.S.C. § 1344. Section 4044 is the ERISA provision dealing with the allocation of assets upon the termination of a Plan. The exceptions cited are necessary because ERISA's fiduciary duty otherwise requires that a fiduciary or an employer not take any plan assets for itself, *see* ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1), which it *may* do in the case of a termination, *see* ERISA § 4044(d)(1), 29 U.S.C. § 1344(d)(1). The critical section, ERISA § 404(a)(1), 29 U.S. C. § 1104(a)(1), provides:

> Subject to [ERISA] section[ ] ... [4044] ..., a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of: providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan....

There is nothing in this or the other cited sections of ERISA that would lead to the conclusion that those elements of the fiduciary standard of care that are not inconsistent with section 4044 do not apply in a termination situation. On the contrary, the natural reading of this provision is that the general ERISA fiduciary duty applies except to the extent that certain provisions of section 4044 are inconsistent with it.

As Judge Friendly summarized the statutory fiduciary duties,

> [a] fiduciary must discharge his duties 'solely in the interests of the participants and beneficiaries.' He must do this 'for the exclusive purpose' of providing benefits to them. And he must comply 'with the care, skill, prudence, and diligence under the circumstances then prevailing' of the traditional 'prudent man.'

*Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). Once a plan has been terminated, it is clear that under certain circumstances any residual assets may revert to the employer. *See* ERISA § 4044(d)(1), 29 U.S.C. § 1344(d)(1); *District 65*, 576 F.Supp. at 1478–79. But there is no reason why the acts and decisions of the plan administrator in calculating and distributing that portion of the plan's assets that will go to participants and their beneficiaries—including the choice of an interest rate—cannot meet the fiduciary standard of care.

Applying the fiduciary standard of care to Harper & Row's choice of an interest rate is consistent not only with the fairest reading of the statutory scheme and of the Court's earlier decisions in this case, but also with the only two sources with which the Court is familiar that have addressed the issue. First, in *Cooke v. Lynn Sand & Stone Co.*, 673 F.Supp. 14 (D.Mass.1986), defendants' motion for summary judgment was denied in a suit challenging the interest rate used in a termination situation, because, *inter alia*,

> a jury could reasonably find that the Trustees ... violated their fiduciary duties to the participants and their beneficiaries by attempting to maximize the amount which would revert to [the employer] by minimizing the benefits paid to the participants.

673 F.Supp. at 24. Second, the United States Department of Labor has issued a "Letter on Fiduciary Responsibility and Plan Terminations," in which it takes the position that "activities undertaken to implement the termination decision are generally fiduciary in nature," and that "the choice of an interest rate in order to determine the amount of a lump sum payment should be treated as fiduciary activity." 13 Pens.Rep. (BNA), 472–73 (March 17, 1986).[3] Harper & Row has cited no authority to the contrary.

■ Therefore, in choosing an interest rate in a termination situation, a plan administrator, or in this case Harper & Row, must not only meet the minimum requirements of the regulation, but must also com-

---

**3.** Because I accept the legal proposition set forth in the Labor Department letter, and because my denial of summary judgment accords with the position advanced by the PBGC, a defendant and cross-claimant in this action, I need not address the extent of deference that is owed to these agencies' interpretations of the statutes and regulations at issue.

ply with the general fiduciary standards set forth in ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). This in no way leaves 29 C.F.R. § 2619.26 a dead letter. That regulation continues to establish the basic requirement that must be met—namely, that lump-sum benefits must amount at least to "the present value of the normal form of benefit provided by the plan payable at normal retirement age, determined as of the date of distribution using reasonable actuarial assumptions as to interest and mortality." 29 C.F.R. § 2619.26(b)(1). The fiduciary duty in effect operates as a lens through which the plan administrator's conduct, in proceeding under the requirements of the regulation, is to be viewed. The fiduciary duty is not entirely separate from the plan administrator's obligations under the regulation, therefore, but governs the manner in which the administrator must proceed in carrying them out.

Harper & Row has not argued that summary judgment must be granted if it was subject to a fiduciary duty in addition to the requirements of the regulation. Since I have concluded that such a further duty exists, summary judgment for defendants is barred by Harper & Row's candid admission that it chose to use the insurance company's interest rate without even knowing what that rate was, Memorandum of Harper & Row Defendants In Support of Motion for Summary Judgment at 19. Aside from the question of whether Harper & Row acted in accordance with other elements of its fiduciary duty, this failure to investigate at least raises issues of fact as to whether Harper & Row acted with the care, prudence and diligence required by ERISA § 404(a)(1)(B), 29 U.S.C.

§ 1104(a)(1)(B). *See Leigh v. Engle,* 727 F.2d 113, 125–26 (7th Cir.1984), citing *Donovan v. Bierwirth,* 680 F.2d at 272 (fiduciaries "are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries"); *see also Katsaros v. Cody,* 744 F.2d 270, 279 (2d Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).[4]

2. The Interest Rate Chosen

Plaintiffs argue that applying the fiduciary standard of care to the choice of interest rate requires that a plan administrator calculate lump-sum benefits in an amount that could be invested by participants over a long-term period so as to yield upon retirement the same amount that would have been paid by the annuity provided under the terms of the Plan, assuming the participant lived a normal lifespan. For the reasons that follow, I consider the question a difficult one whose resolution will be aided by having the parties focus their attention on it with more precision. Therefore, I decline to adopt such a specific rule at this stage of this case.

Harper & Row correctly points out that § 2619.26 sets out among the interest rates that will "normally be considered reasonable" ones that are simply not available to small investors over a long period of time.[5] In addition, the regulation it provides that payment may be made in lump-sum form of any benefit worth $1,750 or less. Neither the legislative nor the regulatory history sheds any light on the logic behind either of these rules.[6] It may be the case, however, that benefits with a present value

---

**4.** If it is determined at a later date that this failure to investigate did not cause any financial harm to the Plan's participants, then it may perhaps no longer provide a ground for liability. *See Brock v. Robbins,* 830 F.2d 640 (7th Cir. 1987). I do not now address this issue.

**5.** For instance, the interest rate available to Prudential in pricing annuities in this case would not be available over the long term to a small investor, not only because an insurance company invests money in such large amounts and has so many investment options available, but because an insurer like Prudential can structure its investments so as to avoid the need to rein-

vest the returns, which can be used to pay off annuities that are currently due.

**6.** The rulemaking notices published in the Federal Register provide no assistance in determining why the four interest rates listed in the regulation were chosen, or why the regulation states that they "will normally be considered reasonable." *See* 40 Fed.Reg. 57,982 (Dec. 12, 1975) (proposing a rule to be codified at 29 C.F.R. § 2610, now renumbered § 2619, but not including any provision on the valuation of lump-sum benefits); 41 Fed.Reg. 48,484 and 48,-498 (Nov. 3, 1976) (interim regulation and sup-

**36**

below a certain level are simply not available in annuity form, or that the cost of such annuities is prohibitive, as suggested by the $187 charged by Prudential in this case for participants with accrued benefits under $1,000 who chose annuities instead of lump-sum payments. It may also be that when benefits with a very small present value are paid in lump-sum form, participants recognize that the return on any investment would be too small meaningfully to add to their retirement income, and that they therefore tend to spend the lump-sum payments in the short term. If these facts are so, it might be unrealistic to require that lump-sum benefits be calculated so that, in the hands of participants, they are equivalent in value to annuities.

On the other hand, even if small lump-sum payments cannot be converted into annuities and are likely to be spent in the short term, it might still be unjustifiable to discount them to present value using an interest rate unavailable to a participant. Pension benefits represent deferred compensation. *See Trustees of Amalgamated Insurance Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101–02 (2d Cir.1986), citing House Report (Education and Labor Committee) No. 93–533, Oct. 2, 1973, *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639, 4640. The assumption behind the use of a certain interest rate to calculate the "present value" of a benefit is that the lump sum could be invested—even if it in fact will not be—at that interest rate to produce a return upon the participant's retirement in the amount of the benefit, so that the amount of the compensation is the same whether it is received upon termination of the plan or upon retirement. *See generally* 5 Collier on Bankruptcy, ¶ 1129–03[4][f][i] at 1129–62 (15th ed. 1988). The problem raised by this case is that since the interest rate available to the employer is higher than that available to the participant, the present value of a certain sum of money is greater from the employer's perspective than it is from the participant's. Conversely, the present value of a specified benefit amount must be a larger sum in the hands of the participant than it need be in the hands of the employer. If an interest rate that is available to an employer but not to a participant is used to calculate lump sum benefits, then the employer has given what from its perspective is the true present value of the deferred compensation. However, the ERISA fiduciary duty arguably requires that the plan administrator calculate present value from the perspective of the participant, so that the compensation received will be equivalent in value *to the participant* to the amount that she would have received in pension form—even if that requires that the employer provide a lump sum that, when

plemental notice of proposed rulemaking); 46 Fed.Reg. 9492, 9493–94 (Jan. 28, 1981) (notice of final and interim rules).

The $1,750 ceiling on benefits that may be provided solely in lump-sum form upon termination of a single-employer plan appears in the regulations at 29 C.F.R. §§ 2619.26, 2617.4 and 2613.8, but does not appear in the statute. The Multi-Employer Pension Plan Amendments Act of 1980 provides that upon termination of a multi-employer plan lump-sum payments may be made to participants having benefits valued at $1,750 or less, ERISA § 4041A, as amended, 29 U.S.C. § 1341a(f)(1), and that a plan in reorganization status may not pay out annuities valued at more than $1,750 in other than annuity form, ERISA § 4241(c), as amended, 29 U.S.C. § 1421(c). The legislative history of these provisions also sheds no light on why they were adopted. *See* Report of House Education and Labor Committee, H.R.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 91, 101, *reprinted in* 1980 U.S. Code Cong. & Admin.News 2918,

2959, 2969; Report of House Ways and Means Committee, H.R.Rep. No. 96–869, Part II, 96th Cong., 2d Sess. 35, 53, *reprinted in* 1980 U.S. Code Cong. & Admin.News 2992, 3024, 3042.

The origin of the $1,750 ceiling is apparently 29 C.F.R. § 2613.8(b), which provides that the PBGC need not guarantee payment in annuity form of benefits worth less than $1,750. Once again, the notices published by the PBGC in the *Federal Register* do not explain the rationale for this provision. *See* 40 Fed.Reg. 24,206 (June 5, 1975) (notice of proposed rule); 40 Fed.Reg. 43,509 (Sept. 22, 1975) (notice of final rule). As originally proposed, 29 C.F.R. § 2617, which deals with the determination of whether a plan's assets are sufficient to pay out its benefits, required that annuities be paid to all beneficiaries, no matter how small the value of the benefits owed them. 40 Fed.Reg. 48,504 (Nov. 3, 1976) (notice of proposed rule). As finally promulgated, § 2617 included the $1,750 ceiling in order to conform to § 2613. *See* 46 Fed.Reg. 9532, 9534–35 (Jan. 28, 1981).

measured from *its* perspective, is greater than the present value of the benefit. In *Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 7 (1st Cir.1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979), on which plaintiffs rely, the First Circuit held that retirees who were already receiving pensions when the employer terminated a plan and stopped making payments to them were entitled to damages in an amount sufficient for them to purchase an equivalent annuity, even if the employer could have funded an annuity more cheaply. *Hoefel*, however, is not dispositive of this case. Not only is *Hoefel* a pre-ERISA case, but, more importantly, it concerns plaintiffs who were already entitled to receive annuity payments, not plaintiffs like those here who were entitled to lump-sum payments as substitutes for benefits in the future.

In order that all purely legal questions, to the extent possible, may be decided before trial, I invite further legal submissions from the parties on this issue.

I emphasize, however, that application of the ERISA fiduciary duty to the choice of the interest rate used to calculate lump-sum benefits upon termination in no way requires that the plan administrator must choose the hypothetically lowest possible rate. A duty to act solely in the participants' interest, and for the exclusive purpose of providing benefits to them, does not require providing them with a windfall. *See Allen v. The Katz Agency, Inc. Employee Stock Ownership Plan*, 677 F.2d 193, 198 (2d Cir.1982) ("the fiduciary obligation to discharge duties 'solely in the interest of participants and beneficiaries' ... surely did not obligate the trustees to pay Allen more than the value to which the Plan entitled him."). It requires only that, in deciding how much is due to the participants as their fair share, a fiduciary must act as would a prudent person with no interests in mind other than those of the participants.

## CONCLUSION

The Harper & Row defendants' motion for summary judgment is denied. The parties are directed to notify the Court by October 17 of the manner in which they intend to address the plaintiffs' legal contention discussed in Section B.2 of this opinion.

SO ORDERED.