James H. COOKE, Plaintiff,

v.

LYNN SAND & STONE CO.,
et al., Defendants.

Civ. A. No. 85–2474–NG.

United States District Court,
D. Massachusetts.

Nov. 30, 1994.

Ralph D. Gants, Palmer & Dodge, Michael J. Liston, Glass, Seigle & Liston, Boston, MA, for plaintiff James H. Cooke.

Robert M. Gault, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for defendants Lynn Sand & Stone Co., Trimount Bituminous Products Co., Stuart Lamb, Louis E. Guyott.

### AMENDED MEMORANDUM AND ORDER [1]

GERTNER, District Judge.

## I. INTRODUCTION

This is an action brought under Section 502(a)(1)(B) [29 U.S.C. § 1132(a)(1)(B)] of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (as amended), by James H. Cooke, a participant in the Lynn Sand Pension Plan ("the Plan"). Mr. Cooke challenges various determinations made by the trustees of the Plan [2] ("the Plan trustees") with respect to the valuation of his pension benefits.[3] Before the Court for a second time is plaintiff's Motion for Summary Judgment. In an opinion dated July 18, 1986, Judge Wolf granted partial summary judgment to defendants on certain of Mr. Cooke's claims, denied summary judgment on the remaining claims, and ordered the parties to take further discovery on the unresolved issues. *See Cooke v. Lynn Sand & Stone Co.*, 673 F.Supp. 14 (D.Mass. 1986). The parties have apparently settled certain of those issues; only one issue remains.

1. This Amended Memorandum and Order supersedes the Court's original Memorandum and Order dated September 30, 1994.

2. The defendants in this action are Lynn Sand & Stone Company ("Lynn Sand"), Mr. Cooke's former employer and the sponsor of the Plan, Trimount Bituminous Products Co., the corporate parent of Lynn Sand, and Louis E. Guyott II and Stuart Lamb, who are officers of Lynn Sand and the trustees of the Plan.

3. 29 U.S.C. § 1132(a)(1)(B) authorizes suit by a plan beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Briefly stated, the parties' dispute arises out of the decision by the Plan trustees to terminate the Plan in late 1983, and to distribute to all Plan participants and beneficiaries their accrued benefits. Mr. Cooke was offered the option of receiving his accrued benefit in the form of an annuity, or as a lump-sum payment. The trustees determined the value of the lump-sum payment by calculating the present value of the annuity to which Mr. Cooke was otherwise entitled.

Mr. Cooke contends that the trustees erred in calculating the size of his lump-sum payment. In making their calculation, the trustees used an "interest rate assumption" (or "IRA") of 9.5%, a rate found in actuarial tables prepared by the Pension Benefit Guarantee Corporation ("PBGC"). Using this rate, the Plan trustees determined that Mr. Cooke was entitled to $58,987.98. Mr. Cooke maintains that under the terms of the Plan, the trustees were required to utilize a pre-retirement IRA of 6% and a post-retirement rate determined by the Mutual Benefit Life Insurance Company. Accordingly, he claims that his lump-sum payment should have been at least $30,000 higher.

For the reasons stated below, the Court **GRANTS** plaintiff's Motion for Summary Judgment.

## II.  *FACTS*

The record reveals the following undisputed facts.[4] On August 12, 1980, Lynn Sand & Stone Co. ("Lynn Sand") established the Plan to provide pension benefits for its managerial employees. At the time, Lynn Sand was a closely held business owned by the plaintiff James Cooke and other members of his family. Mr. Cooke was the President, Treasurer, a member of the Board of Directors and a minority shareholder of Lynn Sand. When the Plan was established, Mr. Cooke and his father were appointed as the administrators and trustees of the Plan.

On May 18, 1983, Trimount Bituminous Products Company ("Trimount") purchased all of Lynn Sand's common stock. The new owner proceeded to remove all of the previous management from positions of authority. On July 8, 1983, Mr. Cooke was removed from his employment with Lynn Sand and replaced by defendant Stuart Lamb as President and defendant Louis E. Guyott II as Treasurer. Mr. Lamb and Mr. Guyott are also officers of Trimount. On September 7, 1983, Lynn Sand's Board of Directors removed Mr. Cooke from his positions as trustee and administrator of the Plan, replacing him with Messrs. Lamb and Guyott. Shortly thereafter, in November, 1983, the new Plan administrator notified the PBGC that Lynn Sand intended to terminate the Plan.[5] On December 10, 1983, the trustees notified Mr. Cooke that the Plan would be terminated as of the end of the calendar year. On September 25, 1984, the PBGC issued a "Notice of Sufficiency" to the Plan, certifying that the Plan's assets were sufficient to pay all vested benefits which the PBGC had guaranteed.[6]

On May 1, 1984, the trustees wrote to Mr. Cooke, offering him an election between receiving a fully paid-up annuity or a lump sum distribution of his pension benefits. Under the annuity option, Mr. Cooke would receive $1,856.93 per month starting at age 65, with such payments continuing for 120 months or until his death, whichever came first. Under the lump-sum option, Mr. Cooke would immediately receive a single payment of $58,987.98. The letter informed Mr. Cooke that if he did not choose an option, he would be given the annuity.

---

4. Judge Wolf's prior Memorandum and Order in this case describes the undisputed facts in detail. The reader's familiarity with that opinion is assumed.

5. The PBGC is a federal agency charged with insuring pension plans covered by ERISA. 29 U.S.C. § 1341 requires that the PBGC be notified before any plan termination, and prohibits plan administrators from distributing plan assets after termination until such time as the PBGC issues a

"Notice of Sufficiency" stating that the plan has sufficient assets to pay all benefits which the PBGC has insured.

6. Under the statutory provisions in force at the time, Plan administrators were required to notify the PBGC at least ten days in advance of a proposed termination. 29 U.S.C.A. § 1341(a) (West 1985). No Plan assets could be distributed after Plan termination until the PBGC issued a Notice of Sufficiency. *Id.*

Mr. Cooke's attorneys wrote to the Plan's counsel contesting the Plan trustees' determination of his lump-sum amount as well as other issues not presently before the Court. After an exchange of correspondence, the parties were unable to agree on the correct amount of the lump-sum payment. On June 14, 1985, after exhausting his appeals to the Plan trustees, Mr. Cooke filed the instant action.

## III. *LEGAL STANDARDS*

### A. *Summary Judgment Standard*

A motion for summary judgment will be granted when all the relevant pleadings, viewed in the light most favorable to the non-moving party, present no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 7–8 (1st Cir.1990); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990).

### B. *Standard of Review of the Trustees Determination*

In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–957, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Prior to the *Firestone* decision, many courts, including the courts of this Circuit, had applied an "arbitrary and capricious" standard in reviewing benefit determinations under ERISA. *See, e.g. Jestings v. New England Tel. and Tel. Co.*, 757 F.2d 8, 9 (1st Cir.1985). Under that standard, the reviewing court was required to defer to the trustees' determination of an employee's benefits under a plan, so long as

that determination was based on a "rational" interpretation of the plan, (*id.*), and was not made in bad faith. *Miles v. New York State Teamsters Conference Pension Fund*, 698 F.2d 593, 599 (2d Cir.) cert. den., 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983).

Applying this rule in the earlier summary judgment motion, Judge Wolf denied summary judgment to both parties on the interest rate question. Although he found the trustees' justification for their choice of IRA to be "reasonable," [7] 673 F.Supp. at 22, he denied defendants' summary judgment motion on this issue because he found that plaintiff had raised an issue of fact as to whether the trustees had been motivated by "bad faith" in choosing the rate that they did. 673 F.Supp. at 24.

■ With the *Firestone* opinion, three years after Judge Wolf's decision, the Supreme Court dramatically altered the standard of judicial review of benefit determinations under ERISA. The reviewing court must first determine whether the Plan document gives the Plan administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115, 109 S.Ct. 948, 956–957. Such discretionary authority is not inherent in the role of a plan trustee or administrator (489 U.S. at 112–113, 109 S.Ct. at 955–956), and must be "clearly" granted in the plan document. *Rodriguez–Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 583 (1st Cir.1993). If such authority is not granted, the reviewing court must independently determine the benefits to which the employee is entitled under the Plan, applying both trust and contract principles under federal common law. *Id.* at 585.

The parties have referred to the following three sections of the Plan document as setting forth the scope of the Plan trustees' and administrator's authority with respect to the determination of benefits.[8]

(1) Article XI, ¶ 7, which gives the Plan administrator "exclusive control and au-

---

7. He also found that plaintiff's interpretation of his rights under the Plan was "at least equally [as] reasonable [as], and perhaps more reasonable" than, the Plan trustees' interpretation. 673 F.Supp. at 23.

8. The two individual defendants are both the trustees and the administrators of the Plan.

thority over the administration of the Plan,"

(2) Article XI, ¶ 17, which permits the trustee to "consult with legal counsel with respect to the construction of this Agreement,"

and

(3) Article XI, ¶ 22, which provides that the administrator "shall make all determinations as to the right of any person to a benefit."

While each of these provisions describes certain duties or powers of the Plan trustees and administrator, none "clearly" imbues them with any special discretionary authority with respect to the determination of Plan benefits.

■ Article XI, ¶ 7, perhaps the most broadly worded of the three provisions, does little more than indicate the party (in this case the Plan administrator) who has legal authority to manage and administer the Plan's assets. Nothing in the paragraph suggests *how* those assets are to be administered, and in particular whether the administration may be done with discretion, or merely in a ministerial fashion. *Compare Luby v. Teamsters Health, Welfare, and Pension Trust Funds,* 944 F.2d 1176, 1180–1181 (3rd Cir.1991) (broad grant of administrative power does not imply discretion in determining the right to benefits under plan) *with Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37, 39 (11th Cir.1989) (finding discretion where plan documents gives trustees "full power to construe the provisions" of the trust, and "full and exclusive authority to determine all questions of coverage and eligibility").

■ Likewise, Article XI, ¶ 22 assigns to the Plan administrator the duty to make benefit determinations, but does not clothe those determinations with final authority. "Interpretation of terms of a plan and determination of the validity of claims are not, in themselves, discretionary functions." *Rodriguez–Abreu,* 986 F.2d at 583: Absent more, the mere grant of authority to determine claims does not shield a plan administrator or trustee from *de novo* review of its determinations. *Compare Michael Reese Hospital and Medical Center v. Solo Cup Employee Health Benefit Plan,* 899 F.2d 639, 641 (7th Cir.1990) (finding no discretionary authority where plan document gives administrator "authority to control and manage the operation and administration of the plan") *with Boyd v. Trustees of United Mine Workers Health & Retirement Funds,* 873 F.2d 57, 59 (4th Cir.1989) (discretion found where trustees had authority to make "full and final determinations as to all issues concerning eligibility for benefits.").

■ Article XI, ¶ 17 is the weakest of the three provisions and gives absolutely no indication of any grant of final decision-making authority to the Plan trustees. Defendants contend that "by giving the Trustees the option to consult with legal counsel to construe the Plan, the Plan obviously contemplates that the Trustees need not consult with counsel to construe the Plan," (Def. Mem. at 10). Defendants conclude from this unexceptional observation that the authority (implied in Article XI, ¶ 17) to construe the Plan (with or without the assistance of counsel) is discretionary. This argument is groundless on its face and, in any event, certainly fails to meet the standard of clarity announced in *Rodriguez–Abreu,* 986 F.2d at 583.

In short, nothing in the Plan document suggests, much less "clearly" provides, that benefit determinations of the Plan administrator or trustees are discretionary, within the meaning of *Firestone.* Absent such a clear provision, this Court must review the Plan language *de novo* to determine its legally correct interpretation. The Court need not consider issues relating to the Plan trustees' motivation or alleged bad faith in making their determination. *See Firestone,* 489 U.S. at 115, 109 S.Ct. at 956–957. Rather, the Court must construe the Plan document, "without deferring to either party's interpretation" (*Firestone,* 489 U.S. at 112, 109 S.Ct. at 955), and determine the correct amount of Mr. Cooke's benefit, given the undisputed facts surrounding the Plan's termination. Plan terms must be interpreted under principles of the federal common law of rights and obligations under ERISA, which themselves

incorporate state contract and trust law. *Rodriguez–Abreu,* 986 F.2d at 585.

## IV. THE NATURE OF THE DISPUTE

### A. The Significance of the Interest Rate Assumption

In calculating the present value of a benefit which will be received in the future, an actuary will reduce or "discount" the value of the future benefit by a factor based on an "interest rate assumption" (or "IRA") for the period of time between the present and the date on which the benefit is to be paid. This reduction is necessary to account for the time-value of money. Money received today is worth more than money received in the future, since it can be immediately invested and its magnitude will increase over time. By discounting the value of future benefits, the actuary attempts to estimate the amount of money which, invested in the present, would produce the desired benefit in the future.

There is no single "correct" value for the actuary's calculation. The actuary must select an IRA based on an assumption as to how well presently received money will perform once invested. The actual return on investments varies widely over time and among investors. Moreover, an institutional investor, such as a pension plan, may be able to realize a higher return on investment than an individual recipient of a lump sum payment. *See District 65, UAW v. Harper & Row Publishers, Inc.,* 696 F.Supp. 29, 36 (S.D.N.Y.1988).[9] Obviously, the higher the IRA, the lower the amount of the present value of the benefit.[10]

### B. The Parties' Contentions Concerning the Interest Rate Assumption

Although the parties disagree on the ultimate value of Mr. Cooke's lump-sum pension benefit, they do agree that their dispute turns solely on which IRA should have been used in its calculation.

Mr. Cooke contends that the IRA which should have been used in this case is contained in the Plan document. Indeed, Article I, ¶22 of the Plan states that "For the purposes of establishing actuarial equivalence, present value shall be determined by discounting all future payments for interest and mortality on the basis specified in the Adoption Agreement." And Section 1.09 of the Plan document's "Adoption Agreement"[11] states that:

9. The *District 65, UAW* court analyzed the ambiguity as follows:

"The problem ... is that since the interest rate available to the employer is higher than that available to the participant, the present value of a certain sum of money is greater from the employer's perspective than it is from the participant's. Conversely, the present value of a specified benefit amount must be a larger sum in the hands of the participant than it need be in the hands of the employer. If an interest rate that is available to an employer but not to a participant is used to calculate lump sum benefits, then the employer has given what from its perspective is the true present value of the deferred compensation. However, the ERISA fiduciary duty arguably requires that the plan administrator calculate present value from the perspective of the participant, so that the compensation received will be equivalent in value to the participant to the amount that she would have received in pension form—even if that requires that the employer provide a lump sum that, when measured from its perspective, is greater than the present value of the benefit." 696 F.Supp. at 36.

10. This lack of an objectively correct IRA is reflected in the regulations promulgated by the PBGC for valuing plan benefits upon termination. The regulations which were in force at the time the Plan terminated assumed the reasonableness of IRSs determined using at least four different methods.

29 C.F.R. § 2619.26(c)(2) (now codified at 29 CFR § 2619.26(b)(2), see note 12, *infra*) stated, in relevant part, that the following interest assumptions are among those which should be considered reasonable:

"(i) The rate by the plan for determining lump sum amounts prior to the date of termination. This rate may appear in the plan documents or may be inferred from recent plan practice.

(ii) The rate used by the insurer in the qualifying bid under which the plan administrator will purchase annuities not being paid as a lump sum....

(iii) The interest rate used for the minimum funding standard account pursuant to section 302 of [ERISA, 29 U.S.C. § 1082] and section 412(b) of the Internal Revenue Code.

(iv) The PBGC interest rate for immediate annuities in effect on the valuation date ..."

11. The Plan document appears to be a boilerplate form applicable to a wide variety of pension plan types. The "Adoption Agreement," which is incorporated into the Plan document by refer-

"[f]or purposes of establishing actuarial equivalence, benefit payments shall be discounted only for mortality and interest based on the following:

. . .

| | | |
|---|---|---|
| Pre-retirement interest | — | 6% |
| Mortality | — | None |
| Post-retirement interest | — | Mutual Benefit Life Insurance Company Guaranteed Purchase Rate Applicable to Each Contract" |

Defendants acknowledge that the Plan contains its own IRA, but argue that it should not apply in this case because the Plan language specifically provides for a special method of calculating the IRA upon Plan termination, a method which is different from the method to be used while the Plan is ongoing. Defendants refer to Article XIV, ¶ 2 of the Plan document which states, in relevant part, that the Plan trustee is required, in the event of termination, to:

"allocate the assets of the Plan in accordance with Section 4044 of [ERISA, 29 U.S.C. § 1344] for the purposes set forth below, to the extent the assets are available to provide benefits to Plan Participants and beneficiaries. Any residual assets of the plan shall be returned to the Employer after all liabilities of the Plan to Participants and their beneficiaries have been satisfied."

According to defendants, this language requires that the Plan trustees look to regulations promulgated by the PBGC under ERISA Section 4044 to determine the correct IRA for computing Mr. Cooke's lump-sum payment.

The specific regulation upon which defendants rely is 29 C.F.R. § 2619.26. The relevant part of Section 2619.26 read, at the time Mr. Cooke's benefit was calculated,[12] as follows:

(b) Valuation

(1) The value of the lump sum or other alternative form of distribution payable under this section is the present value of the normal form of benefit provided by the plan payable at normal retirement age, determined as of the date of distribution using reasonable actuarial assumptions as to interest and mortality.

.    .    .    .    .

(c) Actuarial Assumption

(1) The plan administrator shall specify the actuarial assumptions used to determine the value calculated under paragraph (b) of this section when the plan administrator submits the benefit valuation data to the PBGC pursuant to § 2617.12 of Part 2617 of this chapter. The same actuarial assumptions shall be used for all such calculations. The PBGC reserves the right to review the actuarial assumptions used and to re-value the benefits determined by the

---

ence, is essentially a "fill-in-the-blanks" checklist in which the Plan sponsor specifies various parameters of the Plan's operation.

12. The quoted text of this regulation is accurate as of 1983, when the Plan was terminated. The regulation has since been amended to eliminate paragraph "(a)," which is not at issue here. See 52 FR 47561 (1987). All references in this memorandum are to the 1983 version of the regulation. Paragraph "(a)" reads as follows:

(a) Applicability. A benefit that is payable as an annuity under the provisions of a plan need not be provided in annuity form if—

(1) The monthly amount of the benefit is less than the smallest monthly benefit amount normally provided by an insurer;

(2) The present value of the benefit determined under this paragraph is $1,750 or less; or

(3) The plan provides for an alternative form of distribution, and the plan administrator submits a statement to the PBGC in which he or she certifies that—

(i) the participant elected, in writing, the alternative form of distribution;

(ii) the participant was informed, in writing, before he or she made the election, of the estimated amounts of the annuity and of the alternative form to which he or she is entitled with reference to any risks attendant to the alternative form; and

(iii) the participant was notified, in writing, before he or she made the election, that his or her election would not be given effect unless the plan should close out under a Notice of Sufficiency and the PBGC does not guarantee the benefit payable in the alternative form.

plan administrator if the actuarial assumptions are found to be unreasonable.

(2) The following interest rate assumptions are among those that will normally be considered reasonable.

(i) The rate by the plan for determining lump sum amounts prior to the date of termination. This rate may appear in the plan documents or may be inferred from recent plan practice.

(ii) The rate used by the insurer in the qualifying bid under which the plan administrator will purchase annuities not being paid as a lump sum.

(iii) The interest rate used for the minimum funding standard account pursuant to § 302 of the Act and § 412(b) of the Internal Revenue Code.

(iv) The PBGC interest rate for immediate annuities in effect on the valuation date set forth in Appendix B to this part.

Defendants argue that this language has the effect of overriding or at least limiting the IRA provisions contained in the Plan document, and provides an alternative basis for determining the correct IRA to be applied in Mr. Cooke's case. Specifically, defendants contend that the provision requiring that the Plan trustees choose a "reasonable actuarial assumption" (29 C.F.R. § 2619.26(b)(1))—when reporting the value of lump-sum benefits to the PBGC—compels them to evaluate whether the rates contained in the Plan document are reasonable, or at least permits them to choose freely from one of the several "reasonable" rates described in the regulation.

Notwithstanding the fact that the regulation presumptively accepts as reasonable the IRA contained in the Plan, 29 C.F.R. § 2619.26(c)(2)(i), defendants claim that that presumption is rebuttable, and should be overcome in this instance.[13] According to defendants' calculation, the lump-sum which Mr. Cooke would receive were they to use the IRA contained in the Plan document would be sufficient to buy at least two annui-

ties providing benefits equal to his Accrued Benefit under the Plan. Defendants characterize this result as a potential "windfall" to Mr. Cooke, and argue that any "reasonable" interest rate assumption (such as the 9.5% rate they chose) would and should not produce such a result.

## V. ANALYSIS

In determining whether the trustees' determination was proper, there are two questions which this Court must decide. The first question is whether the IRA specified in the Plan document is a "reasonable" one, within the meaning of Section 2619.26. If the Plan-specified IRA is not reasonable, Section 2619.26 prohibits its use in calculating lump-sum benefits. If the Plan-specified IRA is reasonable, the Court must then decide whether Section 2619.26 permits Plan trustees to use other reasonable rates notwithstanding the one specified in the Plan document.

"A regulation must be interpreted so as to harmonize with and further and not to conflict with the objective of the statute it implements." *Emery Mining Corporation v. Secretary of Labor*, 744 F.2d 1411, 1414 (10th Cir.1984). "In interpreting statutes and regulations, courts must try to give them a harmonious, comprehensive meaning, giving effect, when possible, to all provisions." *McCuin v. Secretary of Health and Human Services*, 817 F.2d 161, 168 (1st Cir.1987). Accordingly, the "reasonableness" requirement contained in § 2619.26 cannot be read in a vacuum, but must be understood in light of the larger goals of the statute which it implements.

■ Based on my reading of relevant statutory and regulatory provisions, and the keeping in mind the purposes of ERISA, I conclude that the IRA specified in the Plan document is reasonable, and nothing in ERISA or the PBGC regulations precludes its use in this instance.

At the outset, I note that Section 2619.26 creates at least a rebuttable presumption as

---

**13.** In their initial Memorandum of Law, which was written before *Firestone*, defendants state that although the 6% rate was a reasonable one, the trustees were not arbitrary and capricious in using the 9.5% rate. (Def.Mem. at 17, n. 25). In their post-*Firestone* Memorandum, defendants now claim that the trustees were constrained by the language of the regulation to reject the 6% rate as unreasonable. (Def.Sup.Mem. 11–12).

888

to the reasonableness of the interest rate used by the Plan prior to termination. (29 C.F.R. § 2619.26(c)(2)(i)). While defendants argue that this presumption should be rebutted in this instance, they have provided this Court with no compelling reason to do so.

Defendants' principal argument is that the interest rate in the Plan is unreasonable because it would provide Mr. Cooke with a "windfall," an amount far in excess of the "real" value of his accrued monthly benefit. But this argument ignores the fact that Mr. Cooke's benefit (including the lump-sum option) is a contractual right, which was promised to him by defendant Lynn Sand. *See Pratt v. Petroleum Production Mgt., Inc. Employee Savings Plan & Trust,* 920 F.2d 651, 661 (10th Cir.1990); *accord Hoefel v. Atlas Tack Corp.,* 581 F.2d 1, 4–5 (1st Cir. 1978) *cert. den. sub nom Atlas Tack Corp. v. Mahoney,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979) (pre-ERISA case). Lynn Sand chose to specify the actuarial assumption that would be used in calculating lump-sum benefits. Mr. Cooke was entitled to rely on this specification in calculating the value of his compensation package, and this Court may not now substitute its own judgment as to the propriety of the amount of that compensation. *See Carr v. First Nationwide Bank,* 816 F.Supp. 1476, 1495 (N.D.Cal.1993) (enforcing "what appears to be an excessively generous" deferred compensation plan under ERISA where employer failed to provide any legal reason for setting aside the agreement).

The reasonableness of the Plan's stated IRA is all the more apparent when viewed in the context of the PBGC pension insurance scheme [14] under which § 2619.26 was promulgated. Congress designed ERISA to "mak[e] sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman Corp. v. PBGC,* 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980). *See also PBGC v. LTV Corp.,* 496 U.S. 633, 636–638, 110 S.Ct. 2668, 2671–2672, 110 L.Ed.2d 579 (1990). Given this goal, the PBGC has an

---

14. ERISA protects pension benefits in two complimentary ways. First, by "provid[ing] for a minimum funding schedule and prescribed standards of conduct for plan administrators." ERISA limits the likelihood that pension plans will become underfunded. *Nachman Corp. v. PBGC,* 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980). ERISA imposes a high degree of fiduciary duty on plan trustees (29 U.S.C. § 1104) and prohibits employers from unilaterally amending plans to reduce an employee's accrued benefits. 29 U.S.C. § 1054(g). When an employer terminates a plan, the plan is legally obligated to pay out, to the extent funded, all benefits, whether or not vested, which employees have accrued to date. 26 U.S.C.A. § 411(d)(3) (West 1988).

The second way that ERISA protects pension benefits is by guaranteeing that employees will receive their pension benefits even in the event of underfunding. Title IV of ERISA (29 U.S.C. § 1301 *et seq.*), establishes a system of pension fund insurance administered by the PBGC. *See, generally PBGC v. LTV Corp.,* 496 U.S. 633, 637–638, 110 S.Ct. 2668, 2671–2672, 110 L.Ed.2d 579 (1990). Under this title, qualified defined benefit pension plans pay mandatory annual insurance premiums to the PBGC, which in turn guarantees that plan beneficiaries will receive the benefits to which they are entitled. *Id.*

Because it serves as the ultimate guarantor that pension plans will make good on their promises to employees, the PBGC is empowered to terminate financially distressed plans by placing them into trusteeship. In addition, before any plan may voluntarily terminate, the plan administrator must notify the PBGC, in order to permit the PBGC to determine whether the plan has sufficient assets to pay all guaranteed benefits. 29 U.S.C.A. § 1341(a) (West 1985). The plan administrator may not distribute the assets of the plan until the PBGC makes such a determination. *Id.* If the PBGC finds that a plan's assets are insufficient to pay guaranteed benefits, it must appoint a trustee to administer the termination of the plan. 29 U.S.C.A. § 1341(c) (West 1985).

Whether or not a plan is placed in trusteeship, the ensuing liquidation of plan assets must proceed according to the rules specified in ERISA section 4044, 29 U.S.C.A. § 1344 (West 1985). Under that section, plan benefits are classified into a number of (statutorily defined) priority categories, so that claimants with higher priority claims are given preference in the distribution of plan assets. Claims guaranteed by the PBGC are given the highest priority in order to protect the PBGC against attempts to evade the limits on its insurance of benefits. *Mead Corp. v. Tilley,* 490 U.S. 714, 718, n. 2, 109 S.Ct. 2156, 2159, n. 2, 104 L.Ed.2d 796 (1989). If claims in all categories can be satisfied with existing fund assets, section 4044 permits the plan sponsor (i.e. the employer), to recoup any remaining surplus if the plan document so provides. 29 U.S.C.A. § 1344(d)(1) (West 1985).

interest in insuring that financially troubled pension plans do not manipulate their interest rate assumptions so as to provide unreasonably small benefits to employees.[15] *See District 65, UAW v. Harper & Row Publishers, Inc.*, 696 F.Supp. 29, 32–35 (S.D.N.Y. 1988) (question of fact existed as to whether plan fiduciaries used an unreasonably high IRA to provide unreasonably small benefits, even where that IRA was one of those specified in § 2619.26 as "normally considered as reasonable"). *Cf.* 29 U.S.C.A. §§ 1053(e)(2), 1055(g)(3) (West 1985) (1984 ERISA amendment requiring the value of certain non-termination lump-sum distributions to be calculated using an interest rate "not greater" than the PBGC rate). Conversely, the PBGC has no interest in reducing the size of Mr. Cooke's contracted-for benefit, absent some indication that the payment of such benefit would result in underfunding, or otherwise jeopardize the ability of the Plan to pay other promised benefits. In this case it is undisputed that the Plan has more than enough assets to pay Mr. Cooke a lump-sum calculated at the Plan-specified rate.

■ Moreover, requiring the Plan trustees to use the higher interest rate in this instance would further undermine ERISA's goals by effectively reducing, without a written plan amendment, the value of the benefits which Mr. Cooke had been promised.[16] To be sure, there is some question as to whether ERISA protects the right to a lump sum benefit calculated at a specific rate against a plan amendment changing that rate. *See Steiner Corporation Retirement Plan v. Johnson & Higgins of California*, 31 F.3d 935, 939–940 (10th Cir.1994). Nevertheless, it is the case that an employer is contractually bound to honor the terms of a plan until it is amended, and that amendments must be in writing to be effective. *Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26, 32–33 (1st Cir.1991).[17] It would

---

**15.** Section 2619.26 is intended to assist the PBGC in insuring that pension plans have sufficient assets to cover their vested benefits upon termination and that those assets are distributed in accordance with statutory requirements. Nothing in the structure of Part 2619 or its statutory parent suggests it was intended to guard against overgenerous pension plan provisions.

29 C.F.R. Part 2619, of which Section 2619.26 is a constituent, is entitled "Valuation of Benefits" and was promulgated by the PBGC in order to implement the "sufficiency" test and the allocation procedures described above. As the regulations explain:

"The purpose of this part is to establish the method of determining the value of plan benefits under terminating non-multiemployer pension plans covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended. This valuation is needed for both plans trusteed under Title IV and plans which are not trusteed. For the former, the value of plan benefits is needed to allocate plan assets in accordance with Part 2618 of this chapter and to determine the amount of any plan asset insufficiency. For the latter, the valuation is needed to allocate assets in accordance with Part 2618 and to distribute the assets in accordance with part 2617." (29 C.F.R. § 2619.1).

In other words, Part 2619 establishes the financial principles for valuing plan benefits, in order to determine whether plan assets will be sufficient to pay them upon termination, and in order to allocate the plan assets needed to cover the benefits in each category as required by Section 4044.

**16.** It is quite clear that if the Plan had not terminated. Mr. Cooke would have had the option of requesting a lump-sum benefit calculated using the Plan-specified IRA. Article IV, ¶ 2 of the Plan document states that a Participant may elect "with the consent of the Trustee," to receive a lump sum "equal to the Actuarial Equivalent of the Normal Retirement Benefit." The term "Actuarial Equivalent" is defined in Article I, ¶ 22 of the Plan document as incorporating the Plan-specified IRA.

Although the Plan requires the consent of the trustee before a participant may elect the lump-sum option, it is undisputed that such consent was given here. If the Plan trustees had refused to grant such consent, their decision would be scrutinized under the fiduciary duty standards of 29 U.S.C. § 1104. *See Frary v. Shorr Paper Products, Inc.*, 494 F.Supp. 565, 568–569 (N.D.Ill. 1980). Under those standards, this Court would have to inquire whether the decision was made "solely in the interest of the participants and beneficiaries" of the Plan. *Id.* Since the Plan was sufficiently funded to pay lump-sum benefits at the time of termination, it is difficult to imagine how such a refusal could have been justified by any legitimate fiduciary concerns.

**17.** Indeed, in *Steiner Corporation, supra,* a plan actuary was held potentially liable for malpractice for failing to notify the plan sponsor that it could amend the plan by changing the interest rate for calculating lump sum benefits. Because this resulted in a delay in amending the plan, the plan sponsor suffered a loss since it was required to make lump sum payments at the less advanta-

make no sense to interpret a PBGC regulation so as to require plan sponsors to change their written funding formula without a written plan amendment when the statute forbids that very practice. I therefore find that nothing in Section 2619.26 prohibits the Plan sponsor in this case from using the interest rates contained in the Plan document.

■ This leads to a second and ultimate question: Even if Section 2619.26 does not *require* the trustees to use an interest rate assumption which differs from the one contained in the Plan, are they *permitted* to do so?[18] In other words, since the regulatory language is itself a mandate to calculate lump-sum benefits using "reasonable" interest rate assumptions, may the trustees completely ignore the Plan language[19] and simply choose one of the "reasonable" interest rates specified in the regulation? For the reasons stated above, such a proposition is not consistent with ERISA's statutory purpose.

Congress created the PBGC to insure the payment of benefits created elsewhere, not to create new benefits not otherwise provided for. *Mead Corp. v. Tilley*, 490 U.S. 714, 723–724, 109 S.Ct. 2156, 2162–2163, 104 L.Ed.2d 796 (1989). An interpretation of Section 2619.26 which permitted a Plan administrator to ignore an interest rate specified in a Plan in favor of one of four contained in the regulation would undermine that goal, as it would give the administrator of a financially marginal plan the incentive to terminate the plan in order to reduce the effective size of its promised benefits. *See Nachman*, 446 U.S. at 381–382, 100 S.Ct. at 1736–1737 ("one of the express purposes of ERISA was to discourage plan terminations"). Any plan which promised lump-sums using an IRA less than the PBGC rate, for example, would be able to avoid paying lump-sums at the

geous rate to employees who retired before the plan was amended. 31 F.3d at 937–938.

18. Defendants argue that it was reasonable for them to use a higher IRA upon Plan termination because they need no longer hedge against market volatility and unfunded benefits. (Def.Mem. at 17). Defendants apparently refer to a different IRA than the one at issue here, namely the figure used to estimate the return on the investment of Plan assets ("the investment rate assumption"). The employer must use this figure in calculating the amount of contributions needed to fund the Plan. The higher this assumed return, the less the employer must contribute to fund a given amount of benefits.

Defendants seem to assume the identity of the investment rate assumption and the IRA used in calculating lump-sum benefits. They reason that upon Plan termination, there will no longer be a need to invest Plan assets, and so no need to use a use a "conservative" investment rate assumption, and that somehow this leaves them free to change the IRA used to calculate lump-sum benefits. This argument is specious since there is no logical connection between the investment rate assumption for an institutional investor and the IRA used for calculating benefits to an individual participant. *See* note 7, *supra* and accompanying text.

19. The terms of the Plan document relating to termination comply with the statutory provisions by providing for the immediate vesting of all accrued pension benefits, and for their payment in accordance with the priority scheme described in ERISA Section 4044.

Article XIV, ¶ 4 of the Plan document provides that "[i]n the event of a termination or partial termination, all Participants shall have a non-forfeitable interest in their Accrued Benefit to the extent then funded." A participant's Accrued Benefit is, in turn, defined in Section 1.07 of the Plan's Adoption Agreement, which states that the Accrued Benefit shall equal the participant's "Normal Retirement Benefit" multiplied by a fraction equal to the ratio of the participant's length of participation in the Plan to length of time from his start of participation until his Normal Retirement Age (i.e., age 65). Section 3 of the Plan's Adoption Agreement defines each beneficiary's "Normal Retirement Benefit" using a complex formula related to the beneficiary's salary and years of service. The parties do not dispute that Mr. Cooke's Accrued Benefit under the Plan was $1,856.93 per month starting at age 65, to continue for ten years or until his death, whichever comes first.

Plan Article IV, ¶ 2.1 provides that each beneficiary may "with the consent of the Trustee" elect to receive his benefit in the form of a lump sum distribution equal to the "Actuarial Equivalent" of the Normal Retirement Benefit (and by reference of the Accrued Benefit). Article 1, ¶ 22 of the Plan states that "[A]ny benefit which, under the terms of this plan, is the actuarial equivalent of a stated benefit shall have the same present value on the date payment commences as such stated benefit. For purposes of establishing actuarial equivalence, present value shall be determined by discounting all future payments for interest and mortality on the basis specified in the Adoption Agreement."

promised IRA by terminating the plan. Such an outcome would be directly contrary to the requirement that plan benefits be stated in writing and that all plan amendments be in writing. *Bellino, supra.* Accordingly, I interpret Section 2619.26 only as specifying the contours of trustee discretion in choosing an IRA where no such rate is otherwise specified in the Plan document. In the case where the Plan document removes from the trustee any discretion in choosing an IRA, as here, the trustee remains bound by the Plan language, so long as that language is consistent with the reasonableness requirement of Section 2619.26.[20]

> Lump Sum Benefit Due Under Lynn Sand Pension Plan     $ 96,892.42
>
> Prejudgment Interest on Lump Sum Benefit (from May 25, 1984 to November 30, 1994 at 12% per annum)     $122,291.51
>
> **TOTAL**     $219,183.93

Attorneys' fees and costs are to be added to and included as part of the Judgment if the Court, after considering the motion plaintiff has notified the Court he intends to file in accordance with Local Rule 54.3, awards attorneys' fees and costs to the plaintiff.

## VI. *CONCLUSION*

For the foregoing reasons, plaintiff's motion for summary judgment is **ALLOWED. SO ORDERED.**

### *JUDGMENT*

In accordance with this Court's Amended Memorandum and Order issued on November 30, 1994, allowing the plaintiff's motion for summary judgment, it is hereby ORDERED that Judgment be entered for plaintiff James H. Cooke against the defendants Lynn Sand & Stone Co., Trimount Bituminous Products Company, Louis E. Guyott II and Stuart Lamb as follows:

**20.** This interpretation does not leave Section 2619.26 a nullity. Some plans do not specify their interest rate assumptions, and in those cases, Section 2619.26, along with the trustees' fiduciary duties, guide the selection of the appropriate interest rate. *See District 65, supra,* 696 F.Supp. at 35.