Aida Pérez RIVERA, Plaintiff

v.

**CORNELL UNIVERSITY and Life Insurance Company of North America, Defendants.**

No. CIV.01–2401 HL.

United States District Court, D. Puerto Rico.

Dec. 16, 2003.

Raymond Sanchez–Maceira, Esq., San Juan, PR, for Plaintiff.

Arturo Bauermeister–Baldric Marie Isabel Rey–Cancio, Hato Rey, PR, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGAL, Chief Judge.

Plaintiff Aida Pérez Rivera brings this suit against Cornell University and Life Insurance Company of North America (together, "Defendants") pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), alleging that Defendants have unlawfully withheld benefits to which she is entitled under a long-term disability insurance policy (the "Policy"). The parties to this litigation have agreed to forego a bench trial, and have instead briefed the following issues for final determination: (1) the appropriate standard of review in this matter (*de novo* or "arbitrary and capricious") and (2) the effect of the insurer's administrative record under that standard. The parties have stipulated to the contents of the record and the relevant policy language. After reviewing the submissions of both parties, the Court ultimately determines that the administrator's decision is subject to *de novo* review, but even under this non-deferential standard of review, Plaintiff has not met the definition of "Totally Disabled" under the Policy and is not entitled to benefits. For this reason, the Court ORDERS that a judgment in favor of Defendants be entered on all counts.

## I.  Background

Plaintiff Aida Pérez Rivera is a 56–year-old woman who was employed as a secretary at Cornell University's Arecibo Observatory ("Cornell") in Arecibo, Puerto Rico until the spring of 1996, when she stopped reporting to work as a result of various medical problems.  The medical conditions complained of fall into three basic categories:  respiratory, musculoskeletal, and psychological.  They include: asthma and allergies; back, head and neck pain; loss of strength in the upper extremities; numbness in the arms, hands, fingers and toes; tinnitus (hearing noises) and ear pain; inability to concentrate and disorientation; and feelings of anxiety, depression, and irritability.

While she was employed by Cornell, Plaintiff was covered by the university's employee long-term disability insurance plan.  On April 13, 1998, approximately two years after she stopped reporting to work, she filed a claim for long-term disability benefits, claiming that she had become disabled on May 15, 1996.  Defendant Life Insurance Company of North America ("LINA"), the claims administrator, exercised its discretion to review Plaintiff's late claim, but her claim was nevertheless denied on October 5, 1998.  Plaintiff appealed the original denial five times and was afforded five opportunities to provide additional medical information to the claims administrator.  Nonetheless, the claims administrator's decision to deny the claim was reviewed and upheld five times.  This lawsuit followed.

## II.  Applicable Standard of Review

■ Following *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the denial of benefits by an administrator of a plan covered by ERISA is reviewed by courts using an "arbitrary and capricious" standard only if the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  If the terms of the plan do not give the administrator or fiduciary discretionary authority to determine eligibility or construe the terms of the plan, judicial review proceeds under a *de novo* standard.  *See id.* at 115.

■ Defendants contend that the Policy gives the claims administrator discretion to determine whether the evidence of disability submitted by the claimant provides suitable proof of the claimed disability.  The only language in the Policy that Defendants can point to in support of their position states that the insurance company will begin paying monthly benefits when "it receives due proof that" the employee satisfied the plan conditions.  Which standard of review applies to this case depends on whether or not this "due proof" language constitutes a delegation of authority to LINA sufficient under *Firestone* to protect Defendant from *de novo* review.

Plaintiff has the upper hand on this question.  First Circuit case law is fairly clear that the "due proof" language found in the plan at issue is insufficient to trigger the deferential "arbitrary-and-capricious" standard of review.  In *Brigham v. Sun Life of Canada*, 317 F.3d 72 (1st Cir.2003), the First Circuit considered whether a policy that allowed the insurer to require "evidence satisfactory to us" vested sufficient discretion in the insurer to trigger deferential judicial review based on the "arbitrary and capricious" standard of review.  The *Brigham* court found that it did, and distinguished the "evidence satisfactory to us" language (which implies discretion on the part of the administrator) from "satisfactory proof" language found in some policies (which does not imply discretion).  *Id.* at 81.  The court wrote: "Circuits that have considered similar lan-

guage view the 'to us' after 'satisfactory' as an indicator of subjective, discretionary authority on the part of the administrator, distinguishing such phrasing from policies that simply require 'satisfactory proof' of disability, without specifying who must be satisfied." *Id.* The court proceeded to cite cases from the Second, Seventh, Eighth, and Ninth Circuits interpreting "satisfactory proof" language alone as not delegating discretion so as to avoid *de novo* review, and noted that only the Sixth Circuit had found that discretionary review is triggered by language requiring "satisfactory proof" without specifying who must be satisfied. *Id.*

In another case, the First Circuit embraced the findings of the district court with respect to the applicability of the *de novo* standard of judicial review, though ultimately reversing and remanding the case on other grounds. *See Cooke v. Lynn Sand & Stone Co.*, 70 F.3d 201, 204 (1st Cir.1995). As described by the district court, the policy in question provided that the plan administrator had "exclusive control and authority over the administration of the Plan" and that the administrator "shall make all determinations as to the right of any person to a benefit." *Cooke v. Lynn Sand & Stone Co.*, 875 F.Supp. 880, 883–84 (D.Mass.1994). According to the district court, "[w]hile each of these provisions describes certain duties or powers of the ... administrator, none 'clearly' imbues [it] with any special discretionary authority with respect to the determination of Plan benefits." *Id.* at 884. The district court distinguished between plan provisions that provide for administration of a plan with discretion and those that provide

for administration "merely in a ministerial fashion." *Id.*

Under the stringent approach adopted by the First Circuit to determine whether a benefits plan grants sufficient discretion to the administrator as to trigger the deferential "arbitrary and capricious" standard of judicial review under *Firestone,* the "due proof" language found in the plan in question in this case is clearly insufficient. Thus, the Court applies the *de novo* standard of review in order to determine whether LINA appropriately denied benefits to Plaintiff.[1]

### III. Effects of the Applicable Standard of Review

The Policy under which Aida Pérez Rivera claims she is entitled to benefits provides as follows:

The Insurance Company will begin paying Monthly Benefits in amounts determined from the Schedule when it receives due proof that:

(1) the Employee became Totally Disabled while insured for this Long Term Disability Insurance; and

(2) his Total Disability has continued for a period longer than the Benefit Waiting Period shown in the Schedule.

Under the terms of the plan, monthly benefits cease when the insured ceases to be Totally Disabled or upon the attainment of the applicable age limit. The plan provides that "[a]n Employee will be considered Totally Disabled if because of Injury or Sickness, he is unable to perform all the essential duties of any occupation for which he is or may reasonably become qualified based on his education, training

---

1. The First Circuit has not decided whether a de novo review is restricted to the record as considered by the decisionmaker in denying the benefits claim, *see Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820, 833–34 (1997), but neither party has argued that the Court should review evidence not available to the administrator at the time of its decisions to deny Plaintiff's claim.

or experience." The "Benefit Waiting Period" under the Policy is 180 days.[2]

The questions of fact before the Court are whether Plaintiff is "Totally Disabled" as defined by the Policy and whether she was Totally Disabled during the required Benefit Waiting Period. Plaintiff and Defendant basically dispute the meaning of reports by various medical personnel regarding Plaintiff's physical and mental health and abilities. The record contains little evidence of Total Disability during the 180-day period beginning on May 15, 1996, the date on which she claims she became disabled. Even evidence of disability following the 180-day period does not show the existence of a disability so comprehensive that Plaintiff is precluded from engaging in any occupation for which she is or could reasonably become qualified.

Plaintiff notes that she has been awarded Social Security Income Disability payments based on a finding that she had "severe" (as defined by the Social Security Act) affective disorder, asthma/allergy, myositis, lumbar radiculopathy, fibromyalgia, gastritis and thoracic outlet syndrome,

2. At a status conference after all trial briefs had been submitted, Plaintiff proposed a new interpretation of the disability policy, and the parties briefed the issue at the Court's request. Plaintiff argues that the 180-day Benefit Waiting Period need not start on the day on which Plaintiff claims she became disabled as long as she can establish that she was Totally Disabled for any 180-day period beginning on or after the date on which she claims she became disabled. Defendant argues that the 180-day Benefit Waiting Period begins on the day on which Plaintiff claims she became disabled (in this case, May 15, 1996). While Plaintiff is correct in her observation that the Policy does not specify the start of the Benefit Waiting Period, other provisions of the Policy prevent her from choosing the most persuasive 180 days to bolster her claim for benefits. The Policy plainly provides that the insured must become Totally Disabled while insured for Long Term Disability Insurance to be eligible for benefits. As set forth in the Policy, insurance coverage ends when the employee's "Active Service" ends, unless Active Service ends due to Total Disability for which monthly benefits are or may become payable, in which case the employee is covered while disability continues during the Benefit Waiting Period and afterwards, as long as benefits are payable. An employee is in "Active Service" if she performs in the usual way all the regular duties of her work for the employer on a full-time basis on a scheduled work day. Because Plaintiff discontinued her work with Cornell University on or about May 15, 1996, her Active Service ended at that time. If she was not Totally Disabled when her Active Service ended, she became uninsured and is not eligible for benefits even if she does become Totally Disabled at some later date and remains disabled for a period of 180 days. If she was Totally Disabled at the time her Active Service ended, she remained insured for the period of Total Disability and became uninsured when her Total Disability ended, unless she returned to Active Service. Because Plaintiff never returned to work, any lapse in Total Disability resulted in a discontinuation of coverage under the Policy and ineligibility for benefits in conjunction with subsequent disability. Any other result would mean that Plaintiff would be insured under the Policy for the rest of her life, regardless of her payment of premiums during periods in which she was not Totally Disabled. For this reason, Plaintiff's argument that she may pick the best (or worst) 180-day period fails.

As just explained, the Court finds Defendants' argument that the Benefit Waiting Period is the 180-day period immediately following the date that Plaintiff claims the disability persuasive and refers to the 180-day period beginning May 15, 1996 as the Benefit Waiting Period for purposes of this opinion. However, because the Court ultimately finds that Plaintiff was not "Totally Disabled" as defined in the Policy during any 180-day period from May 15, 1996 to the date of the complaint the result would be the same if Plaintiff could choose any 180-day period. Thus, the Court need not resolve the question of whether Plaintiff waived her argument regarding the start date of the 180-day Benefit Waiting Period by not including it in her trial brief.

beginning May 15, 1996. However, it is well-settled that "benefits eligibility determinations by the Social Security Administration are not binding on disability insurers ... except perhaps in the rare case in which the statutory criteria are identical to the criteria set forth in the insurance plan." *Pari–Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420 (1st Cir.2000). The language of the plan in the case at bar clearly does not mirror the provisions of the Social Security Act.

## A. Medical Evidence of Total Disability During the 180–Day Benefit Waiting Period

■ The evidence relating to Plaintiff's disability made during the Benefit Waiting Period consists of medical reports from: Dr. Rodriguez Ryan, Plaintiff's treating physician; Dr. Iguina Mella, whose laboratory performed tests on both of Plaintiff's arms; Dr. Jimenez Olivo, Plaintiff's treating psychiatrist; Dr. Martinez Rivera, another general practitioner; and Dr. Rafael Deliz, a pulmonologist.

Dr. Rodriguez Ryan's May 31, 1996 report indicated that Plaintiff had symptoms compatible with entrapment neuropathy (entrapment or compression of a short segment of a nerve at a specific site) and bilateral thoracic outlet syndrome (compression or irritation of nerves, arteries, or veins in the neck and shoulder area). Dr. Rodriguez Ryan recommended physical therapy, and determined that Plaintiff was unable to work for the one-month period from May 31, 1996 to June 30, 1996.

Dr. Iguina Mella performed various tests on Plaintiff following Dr. Rodriguez Ryan's tentative diagnosis, and determined that Plaintiff had Thoracic Outlet Syndrome in the left arm only. Dr. Iguina Mella made no indication as to what effect this ailment would have on Plaintiff's ability to engage in gainful employment.

Dr. Jimenez Olivo, the psychiatrist, saw Plaintiff on four occasions between May 29, 1996 and August 23, 1996. He concluded that Plaintiff exhibited symptoms compatible with a diagnosis of dysthymia [3] caused by allergies and persistent pain, and opined that she was "totally disabled to perform her regular or substantially habitual job or any other remunerative job." Dr. Jimenez Olivo indicated that Plaintiff should continue psychiatric treatment indefinitely.

Dr. Martinez Rivera, a general practitioner who had treated Plaintiff since at least the late 1980s opined that Plaintiff presented a severe anxiety disorder and determined on May 18, 1996 that she should rest until May 30, 1996; on a different form, completed May 20, 1996, he stated that she could return to work in two weeks.

Dr. Deliz, the pulmonologist, filled out various Department of Labor "Attending Physician's Reports" during the Benefit Waiting Period. Plaintiff visited Dr. Deliz at least six times between February and May of 1996. Dr. Deliz indicated that Plaintiff experienced mild asthma and upper airway irritation, indicated that she showed "objective evidence of occupational asthma due to sensitizers at workplace," and explained that "occupational asthma requires removal of employee from workplace or area responsible of chemical source." Dr. Deliz continued: "[i]f reasonable relocation is not feasible, then I rec-

---

**3.** According to the National Institute of Health, "[d]ysthymia is a chronic form of depression, characterized by moods that are consistently low, but not as extreme as other types of depression.... The main symptom of dysthymia is low, dark, or sad mood nearly every day for at least 2 years." www.nlm.nih.gov/medlineplus/ency/article/00918.htm.

ommend definite removal from the workplace. This is to avoid further airway damage and permanent disability." Dr. Deliz made no indication that Plaintiff was incapable of working in an environment which did not contain the sensitizers that exacerbated Plaintiff's asthma.

Defendants contend that these doctors' reports do not establish that Plaintiff was Totally Disabled as defined in the Long Term Disability Policy, and they are correct. Insofar as Plaintiff's musculo-skeletal complaints are concerned, Dr. Rodriguez Ryan and Dr. Iguina Mella reported that Plaintiff suffered from entrapment neuropathy and thoracic outlet syndrome, but Dr. Rodriguez Ryan prescribed only a month off from work, and Dr. Iguina Mella made no comment about the effect of her ailment on her ability to work. The record is clear that Plaintiff suffered from asthma exacerbated by chemicals at her workplace, but there is not even a suggestion that her asthma would prevent her from working somewhere else. As to psychological limitations, Dr. Jimenez Olivo did opine that Plaintiff was unable to perform any remunerative job as a result of dysthymia and should pursue psychiatric treatment indefinitely, but this opinion is contradicted by the fact that Plaintiff stopped receiving treatment from Dr. Jimenez Olivo after August 23, 1996, seeing him just four times during the 180–day Benefit Waiting Period. Plaintiff did not receive any other psychiatric treatment for a period of almost five months, until she saw Dr. Perez Torrado on January 10, 1997 (two months after the conclusion of the Benefit Waiting Period). Furthermore, dysthymia is a disorder that can only be diagnosed after the patient has been experiencing the symptoms for two years. Since Plaintiff was working for almost two years prior to the diagnosis, and there is no indication that Plaintiff's symptoms grew more severe, it is reasonable to assume that Plain-tiff's dysthymia does not preclude her from engaging in employment. While Plaintiff is not a paragon of health, the medical conditions detailed above do not establish that Plaintiff is Totally Disabled.

### B. Evidence of Total Disability following the Benefit Waiting Period

█ Plaintiff's symptoms appear to have worsened in the time since the Benefit Waiting Period ended on November 11, 1996, but they still do not rise to the level of Total Disability, as conservatively defined in the Policy.

Plaintiff's first psychiatric treatment following the 180–day Benefit Waiting Period began on January 10, 1997, and consisted of three visits to Dr. Perez Torrado, the last of which took place on March 20, 1997. On insurance company forms dated April 17, 1997, Dr. Perez Torrado diagnosed Plaintiff with "Major Depressive Disorder" and indicated that Plaintiff "isolates [her]self from the rest of her family," that she "does not socialize with her neighbors and friends," that her "concentration and attention are impaired," that she suffers from insomnia, and that she "has become irritable towards her family." According to Dr. Perez Torrado, Plaintiff was confined to her house and had a poor prognosis. However, Dr. Perez Torrado indicated that although Plaintiff was totally disabled from performing her own job, she was not totally disabled from performing other work. To confuse matters, Dr. Perez Torrado completed the form to indicate that Plaintiff was not a suitable candidate for trial employment in her job or in any other work, and that she is incapable of adapting to job situations that may include "direction, control and planning," "situations involving the interpretation of feelings, ideas, or facts in terms of personal viewpoint," "being required to influence

people in their opinions, attitudes or judgements [sic]," "mak[ing] generalizations, judgements [sic], or decisions based on measurable or verifiable criteria," "dealing with people," "repetitive or continuous" work, "performing under stress," achieving set standards, or "variety and change." Although Dr. Perez Torrado indicated that Plaintiff was totally disabled on April 17, 1997, in response to the question "If patient not now totally disabled, please furnish exact dates of total disability," Dr. Perez Torrado filled in "From 1/10/97 To 1/10/98." On June 29, 1998, more than a year after he had last seen Plaintiff for treatment, Dr. Perez Torrado completed a "Psychiatric Questionnaire" on Plaintiff for "Rosa Brown & Associates, Inc. d.b.a. Occupational Rehabilitation," in which he opined that Plaintiff was emotionally incapacitated to engage in remunerative work, that she could not return to her old job, and that she should continue psychological treatment indefinitely.

Dr. Costas, a psychiatrist, performed an independent medical examination of Plaintiff on April 14, 1998, but deferred diagnosis based on Plaintiff's lack of cooperation and "rather strange behavior, which could not be explained by any diagnosable mental disorder." Dr. Costas wrote:

> It is our medical opinion, with a reasonable degree of medical certainty, that Ms. Perez consciously attempted to exaggerate her symptoms during the interview. This attitude on her part continued in spite of the interviewer's verbal identification of the situation and the explanation given to her and her daughter about the need for a more reliable cooperation on Ms. Perez's part. She behaved in a manner reminiscent of that seen in the severely mentally retarded, which obviously she is not. We cannot explain such an allegedly severe memory loss and inability to understand and follow instructions with any other type

of mental illness, except for organic conditions such as mental retardation and degenerative illnesses. This conditions [sic] or similar ones were never entertained by her physicians. If we accept her psychiatric expert's diagnosis as accurate, then her behavior is well out of context with such diagnosis. With the above considered, we suggest a more careful examination of Ms. Perez's situation, the collection of information from ancillary sources, and the production of her treating psychiatrist's medical records. Only then will we be in a better position to offer a more accurate assessment of the reality of her present mental functioning.

Plaintiff argues that "a plain reading from [Dr. Costas'] report shows that Dr. Costas' evaluation was corrupted by the relationship between the examiner and the examinee." Plaintiff does not elaborate, but does not seem to be referring to a preexisting relationship between doctor and patient. On the whole, the contradictory statements made by Dr. Perez Torrado on insurance forms and questionnaires regarding Plaintiff's psychological difficulties combined with the detailed report of Dr. Costas concluding that Plaintiff drastically exaggerated her disability and Dr. Jimez Olivo's diagnosis of dysthymia do not establish the existence of Total Disability based on Plaintiff's psychological problems.

█ Dr. Mendiguren, a pulmonologist, performed a "Pulmonary Medicine Evaluation" on Plaintiff on August 13, 1998. Dr. Mendiguren concluded that Plaintiff "gradually developed multiple symptoms that initially were precipitated and aggravated at the work site, but have now become chronic." His report describes a variety of respiratory symptoms and "other symptoms." Respiratory symptoms include

"shortness of breath, nasal congestion, loss of smell and taste, sore throat, wheezing, and cough," and are triggered by detergents, strong smells, hot weather, dust, car exhaust, and working with computers. Dr. Mendiguren writes: "While it is reasonable to conclude that the patient could not work further at the Arecibo Observatory given the type of irritants present there, I do not agree with the stipulation that she is unable to work elsewhere due to a respiratory disability." He concludes that "[I]t is evident that this patient's main disability to work as a secretary arise from her multiple musculoskeletal pains and her anxiety condition, which make her unable to work with her hands or to concentrate.... I believe that these complaints are unrelated to her respiratory ailments and should be considered separately in determining her claim for disability."

As part of the long-term disability claim evaluation process, Dr. Deliz (the pulmonologist), Dr. Rodriguez Ryan (Plaintiff's treating physician), and Dr. Martinez Rivera (the general practitioner) completed "Mental Residual Functional Capacity Assessment" and "Physical Ability Assessment" forms in August, 1998. Drs. Deliz and Rodriguez Ryan both concluded that Plaintiff was "Markedly Limited" (3 on a scale of limitations from 1 to 3) in all aspects in the categories of "Understanding and Memory," "Sustained Concentration and Persistence," "Social Interaction," and "Adaptation," except that she was only "Moderately Limited" (2 on a scale from 1 to 3) in her ability to "maintain socially appropriate behavior and ... adhere to basic standards of neatness and cleanliness." Both doctors concluded that Plaintiff could sit, stand, and walk for a maximum of one hour each in an eight-hour workday, and that she could occasionally lift and carry ten pounds, stoop, crouch, kneel, crawl, reach, finger, and engage in simple grasping. In the comments sec-

tion, Dr. Deliz wrote: "occupational asthma and severe emotional problems, unable to produce in gainful employment."

Dr. Martinez Rivera was more conservative about the extent of Plaintiff's disability, and opined that she was "Markedly Limited" in all items in the "Understanding and Memory" category and in half of the items in the "Sustained Concentration and Persistence" category, but only "Moderately Limited" in the other half of the items in the "Sustained Concentration and Persistence" category. Dr. Martinez Rivera determined that Plaintiff was "Markedly Limited" in all aspects of "Social Interaction" and "Adaptation" except for "the ability to ask simple questions or request assistance," and "the ability to be aware of normal hazards and take appropriate precautions" in which she demonstrated only moderate limitation. Dr. Martinez Rivera concluded that Plaintiff could sit for two hours in an eight-hour workday, stand and walk for one hour each in an eight-hour workday, that she could lift and carry ten pounds frequently, and stoop, crouch, kneel, crawl, push, pull, reach, finger, and engage in simple grasping and firm grasping occasionally.

At Defendants' request, Regain Disability Management Services conducted a Transferable Skills Analysis based on the reports of Dr. Martinez Rivera and Dr. Costas, and found that Plaintiff had "transferable skills to perform sedentary strength occupation, within the above stated capacities," and that Plaintiff's skills included "coordinating typing, including technical involving both mathematical formulas and special graphical characters; maintaining files; inventorying and ordering office supplies; reporting; copying; greeting customers at a front desk; distributing mail; typing from dictation; maintaining appropriate calendar; telephone message taking; tele-

phone switchboard operation; general office and clerical duties." Nevertheless, Regain Disability Management Services concluded that there were no jobs that meet Plaintiff's skills, education, physical and mental capacities and wage requirement of $1225.00 per month. Regain independently included the wage requirement in its assessment based on 60% of Plaintiff's basic monthly earnings at the time of disability; the wage requirement was not based on statements by Plaintiff, and it is not a component of eligibility for benefits: the Policy contains no reference to wage limitations or requirements. Regain did not conclude that Plaintiff is "unable to perform all the essential duties of any occupation for which [she] is or may reasonably become qualified based on [her] education, training or experience," the definition established by the Policy, and there is no indication that jobs for which Plaintiff is qualified do not exist outside of the wage requirement assumed by Regain.

Thus, even in the period following the 180–day Benefit Waiting Period, evidence of Total Disability based on psychological problems is contradictory at best and leads to the conclusion that psychological problems have not caused Total Disability for Plaintiff. As during the Benefit Waiting Period, the uncontroverted evidence is that Plaintiff's respiratory problems are real but do not prevent her from engaging in remunerative employment. Finally, there is no evidence of change in her musculoskeletal problems following the Benefit Waiting Period. Therefore, based on a *de novo* review of the record before it and having considered the cumulative effect of Plaintiff's disorders, the Court finds that Plaintiff has not established Total Disability sufficient to entitle her to long-term disability benefits under the Policy.

## IV. Conclusion

For the reasons described above, the Court DENIES Plaintiff's request for relief and ORDERS that judgment be entered for Defendants.

SO ORDERED.